## THE VICKSBURG AND JACKSON RAILROAD COMPANY *v.* WILLIAM L. PATTON.

1. COMMON LAW: HOW FAR IN FORCE HERE.—The common law of England is the law of this State only so far as it is adapted to our institutions, and the circumstances of our people, and is not repealed by statute, or varied by usages which by long custom have superseded it.

2. COMMON LAW: ENCLOSURES : CATTLE DAMAGE FEASANT: TRESPASS.—By the common law of England, the owner of cattle horses, &c., is bound to keep them within a sufficient enclosure; and if he permit them to escape and run at large, and wander upon the premises of another, whether enclosed or not, he is liable for the trespass, and the cattle so trespassing may be distrained *damage feasant.* But this rule of the common law is not adapted to the circumstances and condition of the people of this State, where the population is not dense, and there are large tracts of uncultivated and unenclosed lands fit for the pasturage of cattle; and, moreover, the people of the State have, from its earliest settlement, permitted their domestic animals to run at large in the " range," and depasture on unenclosed lands; and hence the rule is not in force here.

3. TRESPASS : CATTLE, ETC.: COMMON PASTURE.—In this State, the owner of cattle, horses, &c., which are not of a dangerous character, may lawfully permit them to range at large on unenclosed commons; and if, in so doing, they wander upon the premises of another not enclosed by a lawful fence, he is not liable for the trespass, and they cannot be distrained *damage feasant.*

4. REAL ESTATE : RIGHTS OF OWNER.—The owner of unenclosed land may prosecute his lawful business thereon, but in so doing he must exercise reasonable care and diligence to avoid injuring the cattle of others, which may have wandered on the premises.

5. RAILROAD : RIGHTS AND LIABILITIES OF, AS TO INJURIES DONE TO CATTLE, ETC.—A railroad company has the exclusive right to the use and possession and enjoyment of the land upon which their track is located, and they may run their engines and cars on the same at whatever time and with whatever speed they see proper, and not inconsistent with the safety of the persons and property committed to their charge; but this right over the land is no higher nor more extensive than that of its original owner; and hence, if their track be unenclosed, they must run their engines and cars with reasonable care and prudence, so as to avoid injury to cattle which may be depasturing on the track; and if they fail to do so, they will be liable for the injury done.

6. RAILROAD COMPANY: DUTY AS TO CONDITION OF TRACK, ETC.—A railroad company is bound by law to keep the road and machinery in good order, and to have a sufficient number of faithful and trustworthy employees to manage and control the running of their engines and cars; and if, by their failure in any of these respects, the cattle of another depasturing on their unenclosed track be injured or destroyed, they will be responsible to the owner in damages.

7. DAMAGES: MUTUAL FAULT.—Though there be negligence or fault on the part of the plaintiff, remotely connected with the injury, yet if the defendants' fault or negligence was the immediate and proximate cause of the injury, the plaintiff may maintain his action for damages.

8. PRINCIPAL AND AGENT: EVIDENCE OF GENERAL CHARACTER OF AGENT WHEN ADMISSIBLE.—It is competent for a plaintiff, on the trial of an action against a railroad company for damages done by them to his property by the negligent and careless running of their engine and cars, to introduce evidence to show that the general character of the engineer in charge of the train when the injury was done, was that of a reckless and untrustworthy agent.

9. DAMAGES: EXEMPLARY WHEN ALLOWABLE.—The jury may allow exemplary damages against a railroad company, if it appear that the property was destroyed or injured by the gross negligence or wilful and wanton mischief of its agents.

IN error from the Circuit Court of Rankin county. Hon. Jno. E. M'Nair, judge.

The defendant in error sued the plaintiff in error in the court below, for the recovery of damages, which he alleges he had sustained by reason of the killing of several horses belonging to him, through the negligent misconduct of the agents of the railroad company, in running their engines and cars over them.

The defendant below pleaded the general issue, and a trial was had, resulting in a verdict and judgment for the plaintiff.

The evidence on the trial is fully set out in the opinion of the court. The instructions on behalf of the plaintiff below were as follows:—

1. Under the laws of this State, the owner of unenclosed lands has not a right to kill or destroy the horses or mules of another found on such land; and railroad corporations in this State, unless under special provision of the charter conferring such right, are not exempt from this principle.

2. That corporations are liable for the tortious acts or negligence of their servants and agents in the same manner as individuals, unless released by their charters.

3. That the defendants in running their locomotives and trains over their road, are bound to exercise such reasonable care and caution as may be necessary at any point of their road to prevent injury to the property of other persons, and by reason of the want of such reasonable care and caution by defendants, or their agents

or officers or servants, injury is inflicted by their trains upon the property of other persons, the defendants are liable in damages to the owner of such property so injured.

4. If they find, from the evidence, that at the time mentioned in the complaint the defendants were running their train over the road without the officers and machinery, or either, usual and necessary to prevent collision and injury to persons or property of others, and that by reason of such want of officers and machinery, or either, and without any fault of plaintiff in the present case, the horses and mules mentioned in the complaint were run over and killed or rendered useless to the plaintiff by the defendants' train, they should find for the plaintiff.

5. If they find from the evidence that the plaintiff's property mentioned in the complaint was destroyed on defendants' railroad track, in consequence of a want of reasonable care and diligence on the part of the defendants or their agents employed on the train at the time, and without any culpable neglect of the plaintiff directly causing the injury, they should find for the plaintiff.

6. That where there is mutual negligence between "the plaintiff and defendant, the plaintiff may still recover, if the negligence of the defendant was the direct cause of the injury complained of, and the negligence of the plaintiff but the remote cause of such injury; and if they find in this cause, from the evidence, that there was such mutual negligence, and that the negligence of the plaintiff was the remote, and that of the defendant the direct cause of the injury complained of, they should find for the plaintiff."

It is not necessary to the understanding of the opinion of the court, that the instructions given in behalf of the defendant should be set out.

*T. J.* and *F. A. R. Wharton,* for plaintiff in error.

We assume the following grounds, upon either of which this court should reverse the judgment of the court below:

1. That no obligation was imposed upon the plaintiffs in error, either by common law or statute, or by the provisions of the Act of Incorporation, to erect fences along the line of their track to prevent stock from getting upon it.

2. That the accident was the result of the *laches* of the defendant in error, in permitting his horses to go at large, and he is not entitled to recover damages for their destruction, when they have been killed in trespassing upon a railroad track, over which the company have the right to run their trains, at all hours, without obstruction.

3. Even if the engineer was guilty of negligence in running the locomotive, still the plaintiffs in error were not liable, because the first wrong was committed by the defendant in error, in allowing his stock to roam at large.

4. That the verdict was excessive, and for that reason should be set aside.

5. That it was contrary to the charges of the court and the weight of evidence.

On the first point, that no obligation is imposed by the common law upon the plaintiffs in error to erect fences along the line of their track. This question has recently, in various American courts of high authority, received the most elaborate examination, in cases very similar to the one under review.

In the case of *Jackson* v. *Rutland and Burlington Railroad Company*, 25 Verm. R. 155. The Supreme Court of Vermont have bestowed great labor and evinced great research in the examination of the very question under consideration. The Act of Incorporation, in that case, required of the company to build and maintain sufficient fences upon each side of their railroad, through the whole route thereof. But the general principles of the common law in reference to the subject are fully discussed. Chief Justice Redfield, delivering the opinion of the court, says: " The idea of any obligation upon railways to fence their roads, for the security of cattle passing along the highway, must rest upon the hypothesis that such cattle are rightfully in the highway. * * In the present case the cattle were estrays upon the highway. In this State, it is now considered that the owners of cattle have no right to depasture them in the highway. The owner of cattle is here left, as at common law :—he is bound to keep his cattle at home." After further discussion upon the subject, he continues: " We are, then, compelled to fall back upon the common law, as

to the obligation to build fences adjoining the highway, and the right of the owners of cattle to feed them in the highway. And here there seems little doubt. * * * Fences are always good enough at common law, which answer their end of keeping one's own cattle enclosed, and always insufficient, if they fail to answer that purpose. If one's cattle went abroad, either by permission or accident, the owner was liable for all damage. * * * It is of the first necessity that cattle should be excluded altogether, and beyond all peradventure, from the track of the railway. This, it is impossible for the company to do effectually, short of a very disproportionate expense. But the owners of cattle may each restrain his own, as the law requires him to do, with very little difficulty; and if this is not done, the loss should fall upon the owner, who is legally in fault. And if sometimes, through defect of fences, or from any other cause, not implying moral delinquency, his cattle stray accidentally, so to speak, upon the railway, he must be content to take the chance of their destruction, &c. And this has always been regarded as the law upon analogous subjects, where animals trespassing have met their destruction." Citing numerous authorities, both English and American, amongst others, 7 Taunt. 789; 2 Eng. Com. Law R. 183; 9 East, 277; 1 Cowen, Rep. 78; 14 Conn. R. 1; 6 Mass. 99; 29 Maine, R. 282; Ib. 307; 19 Johns. R. 387; 3 Wend. 142; 5 Denio, 255, he concludes a very able and elaborate discussion as follows: "The American courts have, for the most part, adopted the views we have taken of this case, in regard to the right of cattle to depasture in the highways, and the liability of railways for killing them, when casually upon their roads." Citing 29 Maine, R. 282; 19 Johns. R. 385; 3 Wend. R. 142; 5 Denio, 255; 11 Barb. R. 112.

When a railroad company have become possessed of the right of way over land—whether by the voluntary act of the owner in ceding it to them, or by its being taken under the right of eminent domain which exists in the State, and under an assessment of damages by commissioners—they hold the absolute right to the exclusive possession and occupancy of the land so ceded or taken. This right of exclusive occupancy, for all the purposes of the road, is as absolute as that of an owner in fee, and the company owes

no duty to persons or property in the highway, or the fields adjoining the railway, unless *rightfully* there. This principle is consonant with reason, sound sense, common law, and results necessarily from the nature of railways, (if the expression be allowable) and the uses to which they are dedicated. The requirements of the age, the spirit of public improvement, the law of progress, so strikingly exhibited by all the civilized nations of the earth, imperiously demand a medium for the more rapid transportation of person, property and intelligence. Science was taxed—was in *travail* to discover it. The present century originated it. The law throws its protecting arms around the "*iron horse*" and the winged messenger of lightning, to prevent obstructions in their rapid flight. It is their greater speed which has caused locomotives to supersede every other conveyance between the same points. No restriction is placed upon their speed, except in their passage through cities and towns. Their speed is their capital: as absolutely theirs, as his coin and credit are the capital of the banker. If they are to be impeded at every point along the track, and detained until trespassing stock—which should be confined in their owner's close—can be driven off, they would soon be abandoned by the public as a medium of travel. If railroads are to be made responsible for all stock which may be run over and killed by the locomotive, where the engineer—if it be possible to do so—does not stop the engine and train until the obstruction has been removed, it must be because the stock were rightfully there, or because it was incumbent upon the company to fence in their track. If it be their privilege to enjoy the exclusive and unobstructed use of their track in running their cars, that privilege involves the corresponding duty of owners of stock to confine them in their own close that they may not interfere with the free enjoyment of such privilege. There is no middle ground in this matter. Either the owners of stock are bound by law to confine them at home, or railroad companies are to fence in their tracks; for passengers in the cars should not be subjected to the hazard of delay or loss of life, by the locomotive running over stock on the track; and this hazard can only be removed in the one or the other of those ways. It will not be denied that the company had the right to run its cars

over this road at all hours of the day or night, and at any rate of speed they think proper—seeing that there is no restriction in either of these particulars in the provisions of its charter. They have the same immunities in running in the *day* as at *night*. Stock cannot be *legally* on the track by day or night.

The same learned jurist, before quoted, says, that " estrays or cattle suffered to go at large in the highways, for the purpose of pasturage, are altogether at the risk of the owners, until they are brought back to some point where they may rightfully remain. And the fact that the business of the defendants is one of extraordinary peril to cattle coming upon the road, can make no difference. The business of the road is one legalized by the legislature, by universal consent, and one where the public, at present, make very extraordinary demands, in regard to speed, which it would be ruinous to the interests of the road to disregard."

In another case before the same court—25 Vermont, R. 117, (Supreme Court of Vermont.) *Hurd* v. *Rutland and Burlington R. R. Co.*, Isham, J., delivering the opinion, said: "At common law the owner of a close was not obliged to fence against the cattle of the occupant of an adjoining close, for every man's land is, in the eye of the law, inclosed and set apart from another's, either by a visible and material fence, or by an ideal, invisible boundary, existing only in contemplation of law, and in either case, every entry, or breach of a man's close, carries with it some damage, for which compensation can be obtained by action. Citing 3 Bl. Com. 209, and 19 Johns. R. 385. The owners of adjoining lands were bound to keep their cattle on their own premises, and prevent them from wandering on the land of others. . . . The owner of a close is not required to guard against the intrusion of cattle belonging to others, but each is required to prevent his own from entering upon the close of the other. 3 Kent, 535; 6 Mass. R. 94. This principle has equal application to owners of land adjoining public highways. 1 Cow. R. 88, n. ; 2 Smith, Lead. Cas. 184, and notes. And applies with still greater propriety and force to lands taken and used for railway purposes. Where no statute requires it the company is not bound to fence their land, for it has been jointly observed in *Vandergriff* v. *Redeker*, 2 Amer. Law

Jour. 116, that the owners of adjoining lands and strangers are bound to keep all cattle off the railway track, as much as they are bound to keep them off each other's farms; and should they fail to do so, they must respond for all consequential damages." He further says, that these principles have been so often and directly decided in this country in relation to railroads that they cannot be considered of doubtful existence or application, as well in States where companies are not required by their charters to fence their tracks, as in those where they are so required. Citing 2 Cushm. 534; 29 Maine, 307; 5 Denio, 258; 11 Barb. 277; 7 Harris, R. (S. C.) 298. Again, he says: "If this case were to depend upon principles of common law, it is evident that no action could be sustained for the injuries complained of in this declaration, for the plaintiff would have been in fault in permitting his cattle to wander from his own premises on the track of this road. The cattle would have been wrongfully there, and all accidents would have been at the risk of the owner.

In *Marsh* v. *N. Y. and Erie R. R. Co.*, 14 Barb. 364. The Supreme Court of New York say, an injury inflicted by the joint agency of two distinct parties, and which would not have happened without the acts of both, cannot be said to have been caused by either of them. A party in fault shall not recover for an injury which would not have befallen him without it. It is enough to make railroad companies responsible for damages resulting from their omission to fence their roads, to innocent parties. That will protect those whose cattle have strayed from their enclosures without their knowledge or fault, or have casually passed over the track when carefully driven on the highway crossing it, or in its vicinity. There is no question but that the accident of which the plaintiff complained was the result of his own carelessness. His own witness testified that the cow pastured in the road and common, and that he saw her on the highway on the morning of the day on which she was killed at night, at large, without any one with her. There was no evidence that cattle were permitted to pasture on the highway in the town of Deerpark, where the accident occurred, by any by-law, if indeed a town by-law could sanction the practice. *And if there had been a lawful ordinance to*

*that effect, it would not have justified the plaintiff's negligence,* or exempted him from its consequences.   That it is gross negligence for a man to suffer his cattle to go at large on the highways in the immediate vicinity of a railroad, there can be no doubt.   The owner not only endangers the lives of his cattle, but the lives and property of the passengers over the road.   To suffer him to re-cover damages of his property under such circumstances, would be not only against private right, but contrary to public policy."   See also 8 Barb. R. 358; Ib. 390; 19 Wend. R. 399; 5 Denio, 255.

The same doctrine is held by the Supreme Court of Michigan, in the case of *Williams* v. *Mich. Cent. R. R.,* in which Pratt, J., delivered the opinion of the court, and in which he discusses at great length, and with masterly ability and research all of the foregoing principles.   Not having met with the report of the case, I submit a certified copy of the decision; amongst other points he makes the following:—" The defendants are the legal owners of the railroad, having acquired it by purchase and grant from the State. . . . Legally the defendants can be required to do no more in rendering the running of their cars safe to persons and property than is required by the provisions of their charter, and the principles of the common law.   By neither are they required to fence in their road, for the protection of other persons' domestic animals, or for any other purpose whatever. . . . If the plaintiff had no affirmative right to graze his horses on the track of the railroad, it follows that they were there wrongfully, inas-much as the common law gave him no such right. . . . Horses in the town of Dearborn being *free commoners,* under some town-ship rule or regulation, does not change the effect of this principle of common law, or the vested rights of the defendants, or other individual citizens.   The idea, that because horses are *free com-moners,* therefore they have the lawful right of trespassing on private property, is absurd—preposterous in the extreme."

The ablest review, both upon principle and authority, which these doctrines have received, either in England or America, may be found in the decision of the Supreme Court of Pennsylvania, delivered by the late learned Ch. J. Gibson, in the case of the

*N. Y. and Erie Railway* v. *Skinner*, 1 Law Reg. 97, in which the following propositions are broadly stated, and enforced with great learning and ability.

A railway company is a purchaser for valuable consideration of the exclusive use of the land over which the track is laid, as an incorporeal hereditament, and may use thereon the greatest allowable rate of speed, without interference from strangers. By the common law of Pennsylvania as well as by the common law of England, the owner of cattle is bound to keep them within his own custody at his peril, though he may let them go at large without incurring liability for entry on unenclosed woodland or waste field, and this because of the peculiar circumstances of the people here. He says: "The conductor of a train is not bound to attend to the uncertain movements of any assemblage of those loitering or vagabond cattle by which our railways are infested. Any other rule would put a stop to the advantages of railway travelling altogether. And, for what deprive the country of one of the best improvements of this most wonderful age? For no more than to enable a few unpastured cows to pick up a scanty subsistence in waste fields and lanes. If the stock of the neighborhood were allowed to block the way, the prohibition of intrusion by drovers or travellers using their own means of conveyance, would be of little use. For the sake of the company and the passengers, the conductor and the subordinates will be vigilant to remove obstructions; *but the protection of the property is merely incidental.* If the owner of it do not attend to it, the servants of the company having their own business to mind, are not bound to do so; and he who trusts his property to the chances of accident, is bound to stand the hazard of the die. Citing *Knight* v. *Abert*, 6 Barr. 472. In that case the intrusion was on woodland; in this, it was on the exclusive possession of ground paid for as an incorporeal hereditament."

Again, he says: "By the common law of England, an owner of cattle is bound to keep them in an enclosure at his peril. . . . Is not the intrusion of an animal on the railway, which has a direct tendency to throw a train off the track, and endanger life and member, an injury to persons involved in the risk. It is

conceded that an American company is not bound to fence its railway, as an American farmer is to fence his fields; and this shows that persons who suffer their stock to go upon it, do so on their own responsibility. . . . The very act of turning them loose is negligence, as regards any one but an owner of a forest or waste field, and the owner is consequently liable to every one else. That he is not answerable for them to a railway company criminally, *like a caitiff*, who has laid a log or bar across the track, is because mischief was not intended by him. But no prudent man in his predicament, would be the first to make a stir about it. . . . Every obstruction of a railway is unlawful, mischievous, and abatable at the cost of the owner or author of it, without regard to his ignorance or intention. . . . We are of opinion, that an owner of cattle killed or injured on a railway, has no recourse against the company or its servants; and that he is liable for damage done by them to the company or its passengers."

So much on the first branch of the first proposition, that by the *common law* it was not incumbent on the company to fence in their track, and as a corollary from the principle established by the authorities cited, that having the exclusive right to the use of their track, and not required to fence it in, it is the duty of the owners of stock, who may reside contiguous to said track to see to it, that they do not wander upon the track; this they must do at the risk of being liable for all damage which may ensue from their being on the track, as they cannot be there lawfully.

We shall be very brief on the second branch of the first proposition, to wit, that no *statute* or *provision of their charter* requires the company to fence in their road to prevent stock from getting upon the track. It is conceded however, that there is no such provision in the charter. If it was not, it would be only necessary to glance through the charter to see that it is entirely silent upon the subject.

On the trial in the court below, the only statutory provision referred to, or relied on in support of the requirement to fence the road, is found in Hutch. Code, 278, §§ 1, 3, Act of 1822. It will be seen upon reference to those sections, that they do not afford a pretext for such an inference. The act itself is entitled " An Act

to prevent breaking of enclosures in certain cases," and declaring what shall be deemed a lawful enclosure.  The first section provides, "that if any stock shall break into any grounds enclosed with a strong and sound fence, five feet high, well staked and ridered, or sufficiently locked, and so close that the beasts breaking into the same, could not creep through, which shall be deemed a lawful fence," &c., the penalty shall be, &c.  That section can have no application to this case, for we have seen that the company are not bound by charter, or common law to fence their track ; and this act, passed many years before a railroad charter was ever enacted or thought of in Mississippi, has relation alone to trespasses committed upon enclosed and culti- vated grounds, either for planting or pasturage.  The third sec- tion is more remote, if possible, from any relation to railways than the first ; it provides nothing more than the penalty for abuse of any stock trespassing upon any grounds enclosed by an insufficient or illegal fence.  The only other authority cited in the court below in support of the latter point, by counsel for defendant in error, was the case of *Dickson* v. *Parker*, 3 How. R. 220.  It is so apparent, from the face of that case, that it does not bear the least analogy to this case, that I forbear comment, only stating that it was a case in which the mule of B. entered, *by an unlawful fence*, the fields of A., and was trespassing there, and was taken up by A., tied in his stable, and struggling to escape, choaked himself to death.  It was held that A. was liable in trespass for the value of the mule.

We come to the third ground of error, that even if the engineer was guilty of negligence in running the locomotive, still the plain- tiffs in error were not liable ; for the first wrong was committed by the defendant in error, in permitting his stock to go at large.  In other words, that there was mutuality of wrong, and in such case neither party can sustain an action against the other.  This point was incidentally involved in the discussion of the first point ; many of the authorities there cited, apply with as much force here.  In the case from Michigan, (before cited,) *Williams* v. *Michigan Cen- tral R. R. Co.*, it is said : " But there is still another view to be taken, and which is equally decisive of the case.  It is a well settled principle of law, that where an injury of which a plaintiff complains,

has resulted from the fault or negligence of himself, or from the fault or negligence of both parties, without an intentional wrong on the part of the defendant, an action cannot be maintained." 8 Iredell, R. 421; 1 Cow. 78; 19 Wend. 399; 21 Ib. 615; 5 Hill. 282; 5 Denio, 255; 4 Met. 49; 7 Ib. 274. "The plaintiff resided in the vicinity of the railroad," (in this case the proof shows within one mile of it,) "and is not only presumed to know the legal rights of the defendant touching their exclusive use of it, but the danger attending domestic animals that are permitted by their owner to be thereon; hence he was guilty of at least some degree of negligence, as well as a want of care and attention to the safety of his own property, to suffer his horses to stray away into a situation of extreme danger. But he was guilty of a culpable degree of negligence in permitting them, without care or pursuit, to stray away from his possession, and be strolling wrongfully along the track of the railroad, where trains of cars were almost constantly running with great speed, day and night; and where they might have been the cause of destroying not only the property, but the lives of others, who were lawfully pursuing their legitimate business." See also 8 Barb. 358; Ib. 390; 14 Ib. 364. Mutual negligence, *if contributive to the injury*, bars an action for it. 6 Whart. R. 311; 9 C. & P. 605.

In this case, it was proved by defendant's own witnesses, that he did not take any *precaution* against his horses going at large, and wandering along the line of the railway, in quest of pasturage, by confining them in his own close, but that, having no grass lots at home, he was in the habit of turning them loose, to find it in his neighbors' grounds. And this too, although he lived within a mile of the track, over which the cars were passing daily. It is clearly inferrible from the evidence on both sides, that such was the object of defendant's negroes riding the horses down to the place where they were working, on the morning of the accident, and turning them loose. They did not ride them there for the convenience of the negroes, but to afford pasturage for the horses. If a liability arises out of the accident, it is in favor of plaintiffs in error, for the damages sustained in their property, for surely the defendant in error was guilty of as wanton, thoughtless, not to say *criminal*

(and only not *criminal,* because of the absence of *mala intentio,*) negligence as was ever heard of in any similar case, by permitting his horses to graze at large in the vicinity of the railway, and where the company was required to take no precaution against stock getting upon the track.

As to the fourth point, that the verdict was excessive, we have only to say the jury returned $1211 90 damages. The proof of the value of the stock, made by defendant in error himself, was only from $550 to $600. In this last respect the verdict is repugnant to reason and common sense, and shows how blindly impelled by prejudice, the jury must have been. See Sedgwick on Damages.

On the last point, that the verdict was contrary to the charge of the court and the weight of evidence, we reserve for oral argument what we have to say, only remarking that the charges given by the court, and which are very numerous, sustain fully every legal proposition necessary to a succssful defence by the plaintiff in error, and every position contended for by us in this brief, and that the verdict is an outrage upon each of those positions.

The interest and importance of the case being one of *first impression in this court,* and intended by the plaintiff in error as a test of their liability in all similar cases, in order that they may know how to govern themselves in the future, is our apology for the otherwise unpardonable length of our argument. In the rapidly extending chain of railroads, destined in a few years to connect all parts of our State, the principles involved in, and the decision to be pronounced by your honors upon this case, will be of transcendant importance.

*Freeman* and *Dix,* on same side,

Cited *Perkins* v. *The Eastern R. R. Co.,* 29 Maine R. 307; *Towanda R. R. Co.* v. ——, 5 Denio, 255; 4 Comstock, 349; *N. Y. & Erie R. R. Co.* v. *Brooks,* 13 Barb. 594; *Clark* v. *S. & W. R. R. Co.,* 11 Ib. 112; 13 Ib. 390.

*Yerger* and *Anderson,* on same side.

*Geo. L. Potter,* for defendant in error.

I suppose the case will be argued for plaintiff in error as it was

below, on the broad ground that this is an age of progress, and all are bound to stand aside at the hazard of consequences from collisions with the fast men of the age. The theory of the defence was, that the common law—the old feudal rule—prevails here, and the owner of stock is bound to keep them *fenced in*—that they are *trespassers on the range*. That defendants—a railroad corporation—has a charter privilege to run at unlimited speed, and is bound to meet the exactions of this manifest-destiny era of progress; and, in a word, that the whole community is to act in subservience to the antics of a railroad company, incorporated for the supposed good of that community. The argument proceeds to the bold length, that the public is become the slave of this corporation, created for its convenience; and I must say, they are able to show decisions, but no *law*, for this strange assertion. They cite the English rule to show, that a beast, straying upon a railroad track, is a *trespasser;* and then cite certain American railroad mania decisions, which declare the company not liable, though such beast is destroyed by its *gross* negligence. It is needless to say all such decisions are a gross perversion of the English law; and they were never heard of until the courts made the "fast trains" their seats of justice. If these decisions are maintained, they declare a rule that must apply to man and beast; and we shall soon have it announced as law, that these corporations may run down and maim the citizen who happens to *trespass* upon their track, and is so unfortunate as not to avoid the *unchecked* train as it thunders on. The theory will be, that the injured person was a trespasser, and the rule of those decisions is that the corporation is not liable for even gross neglect in such a case.

The great importance of this cause to the people of this State, cannot be magnified. It is here as a test case, and the corporators hope to obtain here a precedent which shall secure them for all time to come from the observance of those great rules of social duty which are the very bulwark of society. They would inaugurate here a corporate despotism which has created anarchy upon the lines of the great roads in Michigan, producing results as disastrous to the corporations as to the community. The celebrated conspiracy cases in that State, caused by secret organizations for

the destruction of tracks and depots, attempts to throw off trains,
&c., originated, as is well known, in decisions of the courts exempt-
ing railroad corporations from liability for stock killed by the gross
negligence of train conductors. A like rule declared in Mississippi
will overturn a policy that has prevailed since the settlement of
the State, and compel owners of stock for miles along our extended
railroad lines to abandon their business or *fence in* their pastures
—leaving a large area of country, fit only for grazing, abandoned
and useless. It needs no argument to show that no true friend
of these improvements should desire the establishment of such a
rule. Nothing could more surely stop the progress of such works,
than to have this court define a railroad to be a licensed destroyer
of stock.

The court will be careful to observe, that every decision cited on
this point for plaintiffs in error, is founded on the basis proposition
that, *at common law, stock must be confined*—the owner must *fence
in*, and the public was not bound to *fence out* cattle.

At common law, no such thing as a great *free range*, open to
the whole community, was known; and it is not surprising, that
in those States where the feudal rule prevails, stringent rules
should be enforced against what Ch. Justice Gibson calls "vagrant
cows."

But we insist that no such law exists in Mississippi. Our stray
laws recognize the existence of a *free range*, and prohibit the
wrongful removal of cattle from it. Code, 276, 277, §§ 12, 14,
17, 18; Ib. 939, § 34; Toulmin, 402, 403. Our fence laws abro-
gate the common law rules, and instead of requiring a man to
*fence in* his own stock, they require him to *fence out* the stock
of his neighbors. Code, 278, 279, §§ 1, 2, 3; Toulmin, 271,
*et seq.*

Under similar statutes, it has been held that the common law
rule ceased, and that stock might *rightfully* range on the unen-
closed lands of another. 3 Ohio State R. 172; *Kerwhaker* v. *C.
C. & C. R. R. Co.*, 14 Conn. 293; 16 Ib. 200; *Alabama and
Tennessee R. R.* v. *Harris*, 25 Ala. 231, 232; 5 Gilm. 130; *Seeley*
v. *Peters*, 1 Vermont, 475-6. The law has since been changed
in Vermont.

The same rule has been declared by this court, and it has been held that no action lies, nor is there a right to distrain, *damage feasant*, where stock breaks into a field through defective fences. Though there was, unquestionably, a right of action and of distress at common law, in such a case. *Dickson* v. *Parker*, 3 How. 219.

As this railroad was unenclosed, it is plain there is no pretence to say Patton's stock was *unlawfully* there. And this point established, the very ground-work of the cases cited on the other side is taken away.

It has been well said, " the defendants constructed their railroad with a knowledge that it was the common custom of the county to allow domestic animals to run at large upon unenclosed grounds of the neighborhood; and without the precaution of enclosing its railroad, the company could not sustain an action against the owner of such animals at large, as might happen to wander on the track of the road." 3 Ohio State R. 185.

I may refer to the opinion in this last named case, as a full argument for plaintiff below upon all this part of the cause. It declares the doctrine of free range, and holds a railroad liable for stock, running at large, and negligently killed by the train, on the track.

We have proven that this train was very badly equipped, the engine defective, no brakemen or sand boxes—but one brake, &c., and they prove the track itself was in very bad order. In addition to all this, we show the train was running recklessly, at extraordinary speed, the engineer reckless and excited by liquor, conducting a passenger train round a blind curve, *down a grade*, wet, and covered with grass, as they say—so that stopping was impossible— across a neighborhood road, upon a track so walled with briars and undergrowth, and closed by the culvert, that escape was impossible; and they say it was no negligence so to run under such circumstances, but the mere exercise of *a charter* right. They say it was no carelessness to rush upon that neighborhood crossing, where carriage and vehicles are passing daily; though it was certain that whoever and whatever might happen to be upon that point would meet with instant destruction.

We say the company manifested gross negligence, as well in keeping the track and in the equipment of the train, as in its

management. Upon a question, whether a railroad company had used "reasonable care" to prevent firing property along the road, the court held it was bound to have "engines properly constructed, and in good order, with suitable fixtures for preventing injury by fire, spark-catchers approved and best calculated to avoid such damage, &c.; and should observe "such care and diligence in using the locomotive upon the road, as would be exercised by a skilful, prudent and discreet person, having a proper desire to *avoid* injuring property along the road." 4 Maryland, R. 257, 258.

In considering the question of care or neglect, regard is to be had to all the circumstances of the case. Where a party uses a dangerous instrument of vast power, &c., the care to be observed in its use must be proportionate to the danger likely to result from it.

In Massachusetts the court said, the caution to be observed must be such as would be due care in view of all the circumstances; the weight and velocity of the engine, &c. *Bradley* v. *Boston and M. R. R.*, 2 Cush. 542, 543. The Delaware Courts hold a railroad company bound to use all due precautions, "and travel at a rate prudent under the circumstances." 4 Harrington, 253.

In Ohio the rule is, that he who puts a force in motion shall "skilfully and carefully control it, and with a skill and care proportioned to the power he thus employs. The skill and care must be reasonable; and it is not reasonable when it does not furnish at least ordinary security against injury to others." 3 Ohio State R. 206.

If the engine is inferior, "the greater the obligation to make up for its defects, by the attention necessary to prevent injury." 3 Ohio State R. 213.

In New York, the corporation fails to observe due care if it does not provide "a safe track, safe engine and cars, and a suitable number of competent and faithful men to take charge, &c." *Hegeman* v. *Western R. R. Co.*, 16 Barb. 356; 2 Denio, 440, 441.

In *The Philadelphia and Reading Railroad* v. *Derby*, it was said: "A large proportion of the accidents on railroads are caused by the negligence of the servants or agents of the company. Nothing but the most stringent enforcement of discipline, and the

most exact and perfect obedience to every rule and order emanating from a superior, can insure safety to life and property. The intrusting such a powerful and dangerous engine as a locomotive, to one who will not submit to control and render implicit obedience to orders, is itself an act of negligence, the '*causa causans*' of the mischief." 14 Howard, U. S. 468.

What shall be said of the *care* of this defendant, who placed a defective engine, attached to a train most scantily equipped, in charge of a dissipated, reckless engineer, an incompetent, careless superintendent, and a negro, *without any instructions,* so far as appears, for the management of the train?

This company can plead no special statutory exemption from the rule we seek to enforce.

Corporations, as well as individuals, by the principles of the common law, are bound so to exercise their rights as not to injure others. 23 Pick. 30; 14 Conn. 155, 157.

The company has a charter right to build and operate a railroad, and every citizen may do the same upon his own lands, and by consent, on the land of others. As was said by the court of Ohio, the case stands precisely "as though the road had been owned and the trains run by a private individual. If, under the circumstances, such private individual would be liable, the company is liable." 3 Ohio State R. 204-206.

"No one has the right to put in operation forces calculated to endanger life and property, without placing them under the control of a competent and ever acting superintending intelligence." 3 Ohio State R. 209.

"The right of the defendant to the free, exclusive, and unmolested use of its railroad, is nothing more than the right of every other land proprietor in the occupation and use of his lands, and does not exempt it from the duty enjoined on every person, so to use his own property as not to do any unnecessary and avoidable injury to another." 3 Ohio State R. 184.

"Where they leave their roads open and unenclosed, they take the risk of intrusion from animals running at large, as do other persons who leave their lands unenclosed." 3 Ohio State R. 185.

Considering how powerful and dangerous are the engines put in motion by these companies, the certain destruction that must ensue from collisions, and the certainty that such accidents must occur often, there is great reason to say that a railway company fails to observe due care until it fences in its track. *Quimly* v. *Vermont Central Railroad,* 23 Verm. 393; 25 Ib. 157; 4 Paige, 555.

A due regard to the rights of others would dictate such a course; and I cannot think the question depends at all upon the general question, whether or not the owner of land is bound to fence. It is a mere question of care or neglect, in view of the fact that the company is engaged in sending these dangerous instruments of destruction with resistless force over the land. But it is unnecessary to insist on this proposition here.

If it be argued and decided that plaintiff was negligent, we answer, that the neglect of defendant was the *proximate* cause of the injury, and the action lies, even though plaintiff was negligent in permitting his stock to run at large. 23 Pick. 31, *et seq.;* 19 Conn. 511, 512, 566; 16 Ib. 429, 430; 3 Ohio State R. 189, *et seq.,* and numerous cases cited; 25 Verm. 157; 24 Ib. 487.

In this case the witness, Black, proves that no attempt was made to stop until the train was upon the stock; that the engineer, when warned of danger, replied that he "did not care a damn." The distance from where the stock was first seen was over 340 yards—1020 feet—which proves that the train might have been stopped within that distance, even on a descending grade, wet track, &c., if the train had been properly equipped and manned.

As to the exceptions to proofs offered by plaintiff, the evidence was clearly admissible to show what sort of an engineer defendants placed in charge of the train. It showed his dissipated habits, and this proved carelessness in the selection of an incompetent servant to manage the train. It showed recklessness, manifested by his sounding the whistle solely to frighten stock and vex the planters; and it was also material to explain the cause why the whistle was so often sounded that morning. It proved his habit of sounding it when his duty did not require him to do so. Defendants cannot show wherein this proof was prejudicial, except in so far as it

tended to show the employment of an improper agent, and cannot be heard to complain of its admission.

As to the damages, the verdict ought to have been larger; the value of the stock, the time when it was destroyed, in the midst of the crop, the damage and loss to plaintiff incident to the destruction of his teams at that critical season, when he must supply their place at any cost—and it was very difficult to obtain substitutes—the time the gray mare was worthless, six or eight months, and her value, if well, during that time, proved to have been one dollar per day, interest, &c., &c., entered into the estimate, and it is vain to pretend that it is too much as a mere money verdict.

But when we consider the gross negligence of the company, the wanton, reckless conduct of its agents, the necessity of an example, &c., the verdict will appear exceedingly moderate.

The jury are sole judges of damages in cases of tort. *Leland* v. *Stone*, 10 Mass. 468; *Weld* v. *Bartlett*, Ib. 479.

The mere money damage suffered is not the criterion, but the jury should also consider the circumstances of aggravation, &c. 6 Conn. 520; 3 Fairf. 477.

The judgment is just, and should be affirmed.

HANDY, J., delivered the opinion of the court.

This action was brought by the defendant in error against the plaintiff in error, to recover damages occasioned by the locomotive and cars of the railroad running over and killing or wounding several horses and a mule belonging to the defendant in error; which injury is alleged to have been caused by the negligence, mismanagement and improper conduct of the railroad company or its agents.

It appears by the evidence in the record, that the injury was done in July, 1851, when the cars were on their usual morning trip from Brandon to Jackson; and that the slaves of Patton had ridden the horses to the place where they were at work in the woods, about a mile from the residence of Patton and along a neighborhood road which crossed the track of the railroad, and which was the road used in going from Patton's residence to the place where his slaves were at work. The animals appeared to have been

turned loose to pasture, their owner being in the habit of pasturing them upon unenclosed and uncultivated lands adjoining the railroad track, owned by other persons, and which had been used by the neighborhood generally for pasturage for a great number of years, without objection, such animals having been accustomed to run at large for pasture in the neighborhood since, at least, the year 1829. About the time the injury occurred one of the horses was seen by a witness, standing on the railroad track where the neighborhood road crosses it, and the others were standing near the intersection of the two roads. From that point to the place where the horses were visible by persons on the cars coming from Brandon, it was not less than two hundred yards, and probably more; and from the same point to the culvert, where the collision took place, it was a further distance of about one hundred and forty yards, the track being, for this latter distance, thickly set on both sides with bushes, and on an embankment four or five feet in height. On the morning of the occurrence, the cars were running with unusual rapidity, such as had never been seen before by a witness who lived near the road. This witness was in full view of the cars and of the animals, when the locomotive came within sight of the animals. The whistle was sounded before reaching the place of intersection where they were standing, but there was no change of speed perceived, nor any effort to stop the locomotive, by applying the *brake* or reversing the engine. When the locomotive approached within about one hundred yards of the place where the animals were standing, they turned and ran down the track until they reached the culvert, and being unable to go further or to escape from the track, they were there overtaken by the locomotive and mangled or killed; and the locomotive thrown from the track down the embankment, a distance of some thirty or forty feet.

The train at the time consisted of the locomotive and tender, a negro car, a passenger car and five freight cars; and the persons in charge of it were the engineer, the conductor, and a negro fireman. There was a grade on the track from the culvert to the point where the horses were first visible to the engineer, at the rate

of twenty-four feet to the mile, by measurement, and a moderate curve in the track.

It was proved by an experienced engineer that the engine used on this road at the time, was in good condition—that such an engine, when running at the speed of twenty miles an hour, can be stopped in six hundred feet, by applying the *brakes*, which should be in the front and rear of every car, and worked by competent hands, and by reversing the engine in due time; and if there be sand boxes, to scatter sand upon the track, which is necessary in case it should be wet.    He was of opinion that the engine could not have been stopped in six hundred feet upon this road, from his knowledge of its condition and the train usually attached to it—that if it was wet at the time, the difficulty of stopping would have been thereby increased—but that if every thing had been in perfect order, six hundred feet is a sufficient distance for stopping the engine—that nine hundred feet would be necessary if the track was wet, and there was a grade of even two feet—that *brakes*, with a sufficient number of brakemen, and sand boxes filled with dry sand, are essential to the management of the train with safety.

There was testimony showing that there was much grass on the track at the time, and also testimony to the contrary; and it was shown, that with the track in that condition, it would have been difficult to stop the locomotive; and if the track was in that state, that it was in a very bad condition.

There was also some testimony showing that the track was wet at the time; but there is a clear preponderance of evidence to show to the contrary, that the weather was clear, hot and dry, and that there was no dew on the track at the time.

As to the character of the engineer, the testimony is conflicting. But while there is testimony to show that he was attentive and competent, the weight of evidence tends to show that he was not a careful and prudent man; that he was addicted to dissipation and drunkenness, and sometimes not sober when in the discharge of his duties as engineer; that it was often necessary to awake him in the morning for the cars, after he had been drinking; that there was a constant sounding of the whistle on the morning of this occurrence, and before reaching the point where the animals were found, so

much so as to attract the observation of the neighbors at the unusual rapidity and noise of the cars ; and that the engineer was in the habit of sounding the whistle when there were no cattle on the track, and when there was no occasion for it, and wantonly.

It was in proof by a witness, who was on the locomotive with the engineer at the time, that the engineer had been drinking liquor that morning, enough to feel it, but "was not drunk, but lively ;" that when they first saw the animals, which was at a distance of about two hundred yards from the place where they were crossing the road, this witness remarked to the engineer that there was danger, and that he replied, *he did not care, let them get out of the way;* that he did nothing to stop the train until the locomotive struck the first of the animals, and then the fireman sprang to the *brake* and witness helped him, but without effect ; that about that time, the engineer reversed the engine ; that no order was given to apply the *brake*, the fireman acting of his own accord, and the witness, to save himself.

The testimony of this witness is impeached by the production of a letter, testified by a witness to have been written, at his instance, shortly after the occurrence, to the president of the railroad company, exculpating the engineer from all blame ; which letter he denied in his deposition that he ever wrote or authorized to be written. But in many material respects his testimony was sustained by the other witnesses ; and the question of credibility was one which the jury had the right to determine, under all the circumstances.

It was further proved that the conductor, a lad of about seventeen years of age, was in the passenger car when the collision took place, and had been there for some time, reading a magazine or something of that kind, and paying no attention to the progress of the train ; and that he knew nothing of the danger until he heard the sound of the whistle, when he looked out and saw the animals running ; he sat down immediately and felt a sudden motion like that caused by reversing the engine. He then got out of the cars and found that the engine had run off the track, the negro car across the track, and the passenger car thrown nearly off the track, the animals lying dead or wounded upon the track. This witness

proved that the cars started behind their usual time that morning from Brandon, and were running at the rate of eighteen or twenty miles an hour when the collision occurred.

It was further proved in behalf of the railroad company, by a witness, who was not an engineer, but had been superintendent of this railroad for many years, that he was at the place on the day after the occurrence, and was of opinion that if the engine was running at its usual speed and there was dew and grass on the track, it could not have been stopped, at the point where the accident occurred, in less than one thousand to fifteen hundred feet, with every appliance; that there was a curve and a grade descending towards the culvert, from Brandon, of thirty-two feet to the mile, as he judged by his eye; that there was much grass on the track, and he considered the road, and cars, and locomotive in good condition; that the grass would cause the wheels to slide, and render it difficult to stop the cars.

There was not more than one *brake* to the train, no brakemen, and no sand-boxes, and the track was not fenced in or enclosed.

This appears to be the substance of the evidence, and it is here stated so much at length, in order that some of the questions presented in the case, and depending upon it, may be properly comprehended.

The value of the property destroyed, or injured, was proved to be $550 or $600, and some further damage is shown to have resulted from the injury. The jury found a verdict of $1211 90, which exceeded the value of the property and actual damage proved; and the defendant below moved for a new trial. First, because the verdict was contrary to law and evidence; and, second, because the damages were excessive. This motion was overruled, and the case is brought here for alleged error in that, and in the ruling of the court upon the trial, to which exceptions were taken.

Several questions of great importance, and of the gravest public interest, are here presented for the first time for the determination of this court. Fortunately these questions, though new in this court, have engaged the attention of the most learned courts

in this country and in England; and in the consideration of them, in addition to the aid of the able arguments of the counsel for the respective parties, we have had the benefit of numerous adjudications of other judicial tribunals, involving the same or similar questions. By such aids, we are enabled to come to conclusions satisfactory to our minds, upon a subject of such profound importance in its direct and collateral bearings, and will proceed to state the views we take of the various questions presented for decision.

It is insisted in behalf of the railroad company, that by their charter, they had the absolute and exclusive right to the land covered by their track, with the privilege of running their engines and cars at whatever times and at whatever speed they saw proper, without obstruction; that they were not required by their charter nor by any other law, to fence their track; that the exclusive property in it being in the company, it was a wrong on the part of the owner of these animals to suffer them to be upon the track; that it was his duty to keep them within his own enclosure, or upon his own premises, and that if injury occurred to them, in consequence of being suffered to go at large, and where they might be upon the railroad track, and thereby interfere with the legal and proper business of the railroad, it was by the plaintiff's own wrong, for which he is entitled to no redress; that being on the road wrongfully, and in derogation of the lawful business of the company, they were not bound to pay any attention to them, and might lawfully run their engines and cars in their proper business, without regard to them, and without responsibility for their destruction.

The first point of inquiry, therefore, is, what are the rights and duties of the railroad company, in the use of their road, with reference to the rights of others?

It is certainly true, that they have the absolute and exclusive right to run their engines and cars upon their track in furtherance of the objects of their charter, without interference by others; and that no one else has any right whatever to the use or occupancy of their track. But this right is to be exercised in subordination to the general laws and policy of the State, unless where

the company is, expressly or by necessary implication, excepted from their operation.   And while their duties to those immediately connected with them in the objects of their business, are faithfully to be performed, the rights of others collaterally interested in their operations, are not to be disregarded.   The highest of these duties is that which arises from a proper regard for the safety *of persons* who entrust their lives to the care and skill which are bound to be employed in the use of vehicles of so much hazard and danger. In this respect, the law imposes upon such companies the greatest strictness in providing all things necessary to the safety of passengers, which care, skill and foresight require; and that their agents should be faithful and vigilant, and in all respects competent and trustworthy of the great responsibilities committed to them. Without an implied guaranty by such companies, for fidelity in these respects, the dangerous power given to them could never have been granted.

The relations of the company with other persons, growing out of the use of their franchise, are also governed by the general rules of law, from which, for the most part, they are not exempted by their charter.   Their right of exclusive use and enjoyment of their track, confers no power to violate the rights of others with which the exercise of their right may come in conflict; but must be exercised so as not to injure the rights of others.   It is no greater than the owner of the land, in fee simple, had before it was acquired by the company; and if such owner had no right, in carrying on his lawful business upon his own unenclosed land, to destroy his neighbor's beasts found upon it, neither could this company, in conducting their business, justifiably destroy such animals, unless the act was unavoidable, after the exercise of all due skill, prudence and care, by the company and its agents.   For the rights and powers of the original proprietor, with regard to the land, were at least as high as those of the railroad company, and the rights of the owner of the animals, whatever they were, were as much under the protection of the law as those of the company.   The idea is wholly inadmissible, that in giving the company the use of the land covered by their track, for the purpose of running their engines and cars, it was intended to confer upon

the corporation, privileges and immunities in the land, which the original owner, who had the full and absolute dominion over the same property, to all intents and purposes, did not possess; and it is manifest, that no immunity being provided in their charter, they hold the land subject to the laws and general policy of the State, with no power, as to dominion over it, superior to that of the original proprietor.

Let us, then, test the rights and duties of the parties to this controversy, by the same rules of law applicable to the relations of the proprietor of the land before it was granted to this company, and the owner of the animals, the subject of this suit.

Suppose such proprietor, not having enclosed his land, had had upon it works, in which dangerous machinery was employed, in carrying on his lawful business; or suppose he had had a railroad upon it, and in full operation, performing all the business of such a work, for his individual benefit and profit, but with no safeguards to protect his works against injury from the cattle of his neighbors; what is the rule by which, under such circumstances, he must be governed in the use of his property, in the way he had seen proper to use it, with reference to the encroachment of his neighbors' beasts upon his land, and their interference with his business? It is clear, that there was no *right* in his neighbors *to permit their cattle to encroach upon his property*. But if they had a right to suffer their cattle to go at large in a neighboring range or common pasture, ordinary prudence would dictate, that the proprietor of the land and works should take proper means, by fences or otherwise, to prevent intrusions, which would in all probability be made by them upon his property, and to the injury of his business; and if he omitted to do so, and without such precautions, continued to pursue his business, and use his property, regardless of the fact that the cattle were in the way, and, without the necessary care and prudence to avoid injury to them at the time, and the cattle should be destroyed, he would be responsible; unless under our laws the cattle would be trespassers, and liable to be distrained *damage feasant*.

The question, then, is, whether by our laws and policy, a man is compelled to keep up his cattle, so as to prevent depredations

upon his neighbor's unfenced and unenclosed premises; or whether a man is not justified in suffering his cattle to go at large in the range or common pasture, without liability to those on whose premises, not being lawfully fenced, they may go; and whether it is not required that the owner of lands, before he can justify an injury done to his neighbor's beasts, which have come upon his lands, must not show that the trespass was done notwithstanding he had such a fence as is required by law, or that the injury was unavoidable, and such as could not have been prevented by due care and prudence.

It is urged in behalf of the railroad company, that by the rule of the common law, the owner of cattle was bound to keep them within his own enclosure; that the owner of lands was not required to guard against their intrusion upon his premises, but that the owner of cattle was bound to prevent them from entering upon the premises of others, whether fenced or not; that this rule of the common law prevails here, and that it is unlawful to permit cattle to graze in a neighboring range or common, or unenclosed pasture, from which they may go upon the premises of individuals to their injury; and consequently, that the act of the plaintiff, in permitting his animals to go at large, being unlawful, he is not entitled to any redress for their loss, which resulted from his own wrong.

These positions are sustained by decisions of the Supreme Courts of New York, Vermont, Pennsylvania, and Michigan, founded on the reason, that the rule of the common law prevailed in those States, which compelled persons to keep their cattle off their neighbor's lands, and holding that that principle is applicable to cattle suffered to go at large and found upon railroad tracks, where they were destroyed.    On the contrary, a different rule is held in Connecticut, Indiana, Ohio, South Carolina, and Alabama; *Stadwell* v. *Ritch*, 14 Conn. 293; *Seeley* v. *Peters*, 5 Gilman, 130; *Kerwhaker* v. *Cleveland Railroad Company*, 3 Ohio State R. 172; *Fripp* v. *Hasell et al.*, 1 Strob. Law R. 176; *Nash. and Chatt. Railroad* v. *Peacock*, 25 Alabama, 232; and the rule of the common law is held not to prevail, because it is inapplicable to the condition and circumstances of the people of those States, and

repugnant to the custom and understanding of the people, from their first settlement down to the present time.

It cannot be denied that the common law of England is the law of this State only so far as it is adapted to our institutions and the circumstances of the people, and is not repealed by statutes, or varied by usages which, by long custom, have superseded it; and that where the reason of it ceases, the rule itself is inapplicable. In a densely populated country like England, with small farms and but few cattle, the reason of the rule that every man shall prevent his cattle from going at large, is apparent; and the rule prevails, because it is suited to the condition of that country. The policy of the common law, therefore, was, that it was more convenient that a man should be bound to *fence his cattle in,* than that he shall *fence his neighbors' out.* The same reason may render it applicable in many of the States of this Union, and in those where this rule has been held to prevail.

But the circumstances of our people are widely different from those of such communities. This State is comparatively new, and, for the most part, sparsely populated, with large bodies of woodlands and prairies, which have never been enclosed, lying in the neighborhoods of the plantations of our citizens, and which, by common consent, have been understood, from the early settlement of the State, to be a common of pasture, or, in the phrase of the people, the "*range,*" to which large numbers of cattle, hogs, and other animals in the neighborhood, not of a dangerous or unlawful character, have been permitted to resort. These large numbers of cattle and other animals are necessary to the wants and business of the people, whose great interest is in agriculture; and the large and extensive tracts of land suitable for the pasture of stock, are most generally not required by the owner for his exclusive use. If so required, no one questions his right to fence them in, and to appropriate them accordingly. But until he does so, by the universal understanding and usage of the people they are regarded as commons of pasture, for the range of cattle and other stock of the neighborhood.

This policy is sanctioned by strong reasons of public convenience, growing out of the condition of the people. The greater

part of the lands of the State have been comparatively but recently brought into cultivation. When purchased and taken possession of by their owners, they were wild. The timber had to be cleared, buildings erected, and as much land as could be, brought into speedy cultivation. The settler had but little time to enclose his lands, and therefore he made enclosures only as his necessities and convenience required. He turned his cattle into the range, because it was more convenient to do so than to build fences and keep them within his own enclosures. His neighbors did the same thing; and the practice became general, and thus the usage has established the general rule among the people, that *it is more convenient to make fences to keep the cattle of others out* from lands not intended to be used for pasture, *than to fence their own cattle within their enclosures.* And by this custom a large amount of pasture, which would otherwise be lost, becomes useful and valuable, in rearing great numbers of cattle and stock of various kinds, contributing greatly to the convenience and emolument of our people. It is also highly convenient in rendering a man safe in pasturing his own cattle on his own unenclosed lands, which he could not do with safety if the common law rule prevailed; because his cattle, when pasturing upon his own unfenced lands, would be liable to intrude upon his neighbor, and be subjected to the common law rule arising from the trespass. He would, therefore, be compelled to enclose his own pasture-lands before he could safely use them as such; and such a necessity in the condition of the lands of this State, would be a great public grievance.

For these considerations, the custom has grown up among the people and is well settled by universal acceptation, that a man is entitled to permit his cattle and other stock to go at large in the neighborhood range, and is not liable as a trespasser for the damage done by them to the premises of his neighbor, which are not enclosed by a lawful fence. This being the condition of the people from the first settlement of the State, and the same reasons of convenience still prevailing, it is manifest that the rule of the common law is wholly unsuited to our circumstances, and, upon well settled doctrine, cannot be held to be applicable here.

If there could be a reasonable doubt upon this point, it must be

removed by the provisions of our statutes. These provisions are utterly irreconcilable with the rule of the common law, and are made with reference to the contrary policy which has existed here.

The twelfth section of the Act of 1822, Hutch. Code, 276, which was a re-enactment of an Act passed in the early history of the State, provides that "it shall not be lawful for any person to drive any horses, mules, cattle, hogs, or sheep, *from the range to which the same may belong.*" The next section provides penalties for the violation of that provision. The fourteenth section prohibits animals of a particular character from being suffered *to run at large in the woods*, or in any *enclosed* range. Other sections make it the duty of each owner of horses, or other stock, to have a *brand* and *ear-mark*, and to have the same recorded; the object of which was, that the stock of each owner in the range might be known and designated. And the seventeenth section prohibits the owner from sending or permitting any slave or Indian to go "*into any of the woods or ranges of this State*," to mark or brand any cattle, &c.

These provisions clearly recognize the right of any owner of horses, cattle, or other stock, to put them in the *range*, which means the unfenced wood lands, or other pasture lands in the neighborhood.

Again. The Act of 1822, Hutch. Code, 278, 279, which is a transcript of the Territorial Act of 1807, provides that, "if any horses, &c., shall break into any grounds enclosed with a strong and sound fence, five feet high, well staked and ridered, or sufficiently locked, and so close that the beasts breaking into the same could not creep through, *which shall be deemed a lawful fence,*" the owner shall be liable to the party injured for damages. This provision is altogether useless, if the owner was bound to keep his cattle within his own enclosure; for by that rule he was liable for damages to the party injured by the trespass of his cattle, whether his premises were fenced or not. But it is plain that it was the object of this statute to change the rule of the common law, and to provide that the party whose cattle should intrude upon the premises of another, should not be liable for damages, unless the party injured kept a lawful fence. This intention clearly appears from

the third section of the same Act, which prohibits "*any person injured for want of such sufficient fence*," under a heavy penalty, from wounding or killing any horses, mules, or other stock, trespassing upon their premises.

The policy upon which these enactments are founded, and the acts themselves, clearly establish two principles—first, *that the owner of cattle may rightfully suffer them to go at large for pasture upon the neighboring range ;* and, secondly, *that the owner of lands is bound to keep them fenced with a lawful fence, if he would prevent the intrusion of cattle upon them ; and otherwise, that he cannot complain that the intrusion is unlawful.* And it has been held by this court, that under these provisions, when cattle break through an insufficient fence into the premises of a party, he has no right of action for damages, and cannot distrain *damage feasant*, which were clear rights at the common law ; thus conclusively settling that the rules of the common law are not in force here. *Dickson* v. *Parker*, 3 How. 220.

It is to be observed that the cases above adverted to, holding that cattle found upon a railroad track may lawfully be destroyed, in the prosecution of the business of the company, are founded upon the reason, that the owner was compelled by the rule of the common law to keep them up, and that it was by the violation of that common law duty that the cattle were at large and upon the road ; and, therefore, that the owner, having been guilty of a wrong, is entitled to no redress against the company. Having shown that this rule of the common law does not prevail here, the argument founded upon it fails ; and the conclusion follows, that the plaintiff cannot be considered as a wrong-doer in suffering his animals to go at large for pasture, and that the animals were not unlawfully on the railroad track so as to justify the company in destroying them, without using all due care, prudence and skill, to avoid their destruction.

But it is contended that the railroad company, having the exclusive use of their track, the plaintiff's cattle were improperly there, interfering with the lawful business of the company to the hazard of the lives of their passengers, and impeding the speed which, from the very nature of their business, they were authorized to use in

running their engines upon their track, and, therefore, that the injury was done without wrong on the part of the company.

This position is met with so much clearness and force by the Supreme Court of Ohio, in the case above cited, as to justify our adoption of the views of the subject there taken. The court say, " The defendant's right to the exclusive and unmolested use of its railroad track, is undeniable. And it must be conceded that the plaintiff had no *right* to have his hogs on the track, and that they were there improperly. But how came they there? If the plaintiff had placed them there, or knowing them to be there, had omitted to drive them off, he would have been, perhaps, precluded from all claim to compensation. But it would appear that, in the exercise of the ordinary privilege of allowing these animals to be at large, by the plaintiff, they accidentally and without his knowledge, wandered upon the railroad track. The right of the defendant to the free, exclusive, and unmolested use of its railroad, is nothing more than the right of every other land proprietor in the actual occupancy and use of his lands, and does not exempt it from the duty enjoined by law upon every person, so to use his own property as not to do any unnecessary and avoidable injury to another. Finding the animals upon the track, it was the right, and indeed the duty, of the agents of the company to drive them off, but not to injure or destroy them by unnecessary violence. The owner of a freehold estate in lands, enclosed by a lawful fence, has the right to expel trespassing animals which have broken through his enclosure; but in doing so, he would become liable in damages to the owner of the animals, if they be injured by the use of unnecessary and improper means, although the latter would be bound to make reparation for the injury done to the former, by the trespassing animals. It is not pretended that the railroad of the defendant was under enclosure, through which the plaintiff's creatures had broken. It is true, that there is no law here *requiring* railroad companies to fence their road. But when they leave their roads open and unfenced, they take the risk of intrusions from animals running at large, as do other proprietors who leave their lands unenclosed. If a farmer undertake to cultivate his ground in corn without enclosing it, he would be doubtless troubled by the

destructive intrusions of cattle running at large; but without a sufficient fence, he could not maintain an action against the owner of the animals for the trespass. The defendant constructed its railroad with a knowledge that it was the common custom of the country to allow domestic animals to run at large upon the unenclosed ground of the neighborhood; and without the precaution of enclosing its railroad, the company could not sustain an action against the owner of such animals at large, as might happen to wander upon the track of the road. The owner of the animals, in allowing them to run at large, takes the risk of the loss or injury to them by unavoidable accident; and the company, in leaving its road unprotected by enclosure, runs the risk of the occasional intrusions of such animals upon its road, without any remedy against the owner."

It is a sound and revered maxim of the law, that though a man may do a lawful thing, yet if damage thereby befall another, he shall be answerable for it, if he could have avoided it. Broom, Legal Maxims, 275; *Aldridge* v. *Great Western R. R. Co.*, 4 Scott, N. R. 156. This principle is entirely at war with the doctrine apparently sanctioned by some of the cases cited in behalf of the plaintiff in error, that the nature of their business required them to use great speed, and therefore, that they were justified in running their engines regardless of cattle upon the road, with whatever speed they might think fit, without liability to the owner of the cattle thereby destroyed. Such a doctrine is unfounded in sound law, and would be dangerous and mischievous in the extreme, both to the lives of passengers of the company, and to persons whose rights may be collaterally involved in their operations. For such a rule, while it would give to conductors and engineers upon such road, a free license wantonly to destroy cattle which might casually be upon their track, and in any way impede their progress, would greatly endanger the safety of travellers on the road, by subjecting their lives to the capricious exercise of this liberty by the agents of such companies. These mischiefs would almost necessarily result from such a principle, if sanctioned; and the consequence would be, that all confidence in such works would be destroyed; and, instead of being sources of public convenience, as they would be

under the salutary restraints of law which bind the citizen, they would be converted into instruments of private oppression and public calamity.

Again, it is said that the destruction of the plaintiff's animals was in consequence of his suffering them to be in a situation exposed to destruction, and of which he was bound to take notice; and that the rule is, that where the injury has resulted from the fault or negligence of the plaintiff, or from the fault or negligence of both parties, without any intentional wrong on the part of the defendant, there can be no recovery.

It is already shown, that it was not unlawful in the plaintiff to suffer his animals to go at large in the neighborhood of the railroad, and as that was the remote cause of the injury, it cannot be said to be a wrong or gross negligence. It is true, the highest degree of prudence might have induced him not to suffer his cattle to be at large near the track and exposed to its dangers. But was he bound to use such precaution? He is to be presumed to have acted with a knowledge of the relative legal rights and liabilities of himself and the company. In suffering his cattle to range, exposed to the dangers of the railroad, he subjected himself to the hazard of all that the company might legally do in destroying them, but to nothing further. And they were justified in destroying them only in the necessary prosecution of their business, and when the act should become unavoidable, after the use of such care, prudence and skill, as a discreet man would employ to prevent it. He had the right to act, and must be presumed to have acted, on this rule; and if he suffered by it, but without any violation of it by the company, he would be without redress. But he was not bound to lose his right to range his cattle near the railroad and keep them enclosed, upon the assumption that they would be illegally destroyed by the company, if suffered to go at large near the road. He had as high a right to range his cattle in the neighborhood of the road, as the company had to run its engines and cars along their track; a right prior in time to that of the company, and one equally entitled to be noticed and respected by the company. If the plaintiff was bound to respect their right to run their cars and engines, by keeping his cattle enclosed, in

order to prevent their exposure to the dangers of the road and damage to the company, by parity of reason was it the duty of the company to respect his prior right of range, by keeping fences to protect their road from incursions of his cattle, and to save him from injury by their destruction. The road was under no legal obligation to fence its track, nor was the plaintiff bound by law to keep his animals enclosed, in order to prevent their exposure to the dangers of the road; and so far the legal obligations are equal. But the same rule of prudence that would require the plaintiff to enclose his cattle, in order to avoid the danger of destruction by the railroad, would also demand of the company, as a matter of protection to its property and of safety to the lives of its passengers, to fence its track. If there is any difference in the degrees of duty, it would appear that the latter was much the higher and more imperative, and the delinquency on the part of the company in neglecting it, would, of course, be greater.

It is, therefore, manifest, that the injury cannot be ascribed to the fault or negligence of the plaintiff, in which the defendant is not inculpated. And the most favorable point of view in which it can be regarded for the defendant is, that both parties were mutually in fault, and both the immediate cause of the injury. In such a case, unless the injury be malicious and wanton, the party injured cannot maintain an action, because the injury has been caused by his own wrong.

But this rule is subject to several qualifications, which render it inapplicable to the facts of this case.

1. It does not apply where the party committing the injury might have avoided it by the use of common and ordinary caution; and this is the rule, even where the remote cause of the injury is the *unlawful act* of the party complaining. This is held by numerous authorities. In *The Mayor of Colchester* v. *Brooke*, 7 Q. B., 53 Eng. Com. Law Rep. 339, the plaintiff had deposited and kept a bed of oysters in the channel of a navigable stream, thereby creating a public nuisance; yet the defendant was held liable for running his vessel upon the bed of oysters, greatly injuring them, there being room to pass in the stream without it, because the injury could have been avoided by the use of reasonable care and diligence.

In *Bird* v. *Holbrook*, 4 Bing. 628; 13 E. C. L. R., the defendant had set a spring-gun upon his walled garden, to protect his property from being stolen, and the plaintiff, in climbing over the wall in pursuit of a stray fowl, was shot by the gun; it was held that the plaintiff was entitled to recover damages, although he brought the injury upon himself by a trespass upon the defendant's enclosure. In the case of *Deane* v. *Clayton*, 7 Taunt. 489; 2 E. C. L. R., it is said that the rule "that you shall *do no more than the necessity of the case requires*, when the excess may in any way be injurious to another, is a principle which pervades every part of the law of England, criminal as well as civil, and, indeed, belongs to all law that is founded on reason and natural equity." The same rule is held in *Lynch* v. *Nurden*, 4 1 Ib. 422; *Butterfield* v. *Forrester*, 11 East, 58; *Vere* v. *Lord Cawdor*, Ib. 567; *Vaughan* v. *Menlove*, 32 Eng. Com. Law Rep. 211; *New Haven S. and T. Co.* v. *Vanderbilt*, 16 Conn. R. 421; *Beers* v. *Hous. Railroad Co.*, 19 Ib. 566, and is involved in *Parker* v. *Dickson*, 3 How. 219.

Another qualification to the general rule, that there is no liability upon the defendant when the plaintiff has contributed to the injury, exists when, though both parties be in fault, the defendant has been the *immediate* and *proximate* cause of the injury. This is well settled by authority. *Davis* v. *Mann*, 10 Mees. & Wels. 545; *Trow* v. *Vermont Cent. R. R. Co.*, 24 Vermont Rep. 494, and cases there cited; 3 Ohio State Rep. 194; Broom, Leg. Max. 283.

It may, therefore, be considered as settled law, that though there be negligence or fault on the part of the plaintiff remotely connected with the injury, yet, if at the time the injury was done, it might have been avoided by the exercise of reasonable care, prudence and skill, on the part of the defendant, the plaintiff may maintain his action for the injury.

It follows from these views of the case, that the instructions granted on the trial in behalf of the plaintiff were correct; and that the 2d, 3d, 4th, 5th, 6th, 7th, 8th, 10th, 14th, and 16th instructions in behalf of the defendant were erroneously granted, and the 13th instruction is questionable. And though the verdict was contrary to the instructions given in behalf of the defendant,

it should not for that reason be set aside; because those instructions were erroneous, and should not have been given.

We will next consider the objections taken to the admissibility of certain evidence in behalf of the plaintiff. This testimony tended to show that the engineer on duty at the time this injury was done, had previously been in the habit of sounding the whistle when there was no occasion for it, to frighten animals and to annoy the neighbors on the road. There was testimony showing him to be a man of dissipated habits; and the object of the testimony objected to, with other evidence to the same point not objected to, was to show his character to be that of a reckless and untrustworthy agent. It is not denied that it was competent to show the character of the agent, and his unfitness for the responsible trust reposed in him. It is the imperative duty of such companies to provide skilful, competent, and trustworthy agents, and they are responsible upon their failure to do so, for the consequences of their neglect of duty. *Stokes* v. *Saltonstall*, 13 Peters, 181; 14 How. 468. Upon a question involving his character and fitness for his trust, and the consequent responsibility of the company for his delinquency in these respects, it is not only competent but necessary to inquire into his previous habits and conduct, in order to show that the alleged misconduct at the time of the injury was in keeping with his general character. Frequently it may be out of the power of a party to show positively the reasons of the particular delinquency of such an agent; and in such cases it is proper and necessary to show his general character in order to explain his conduct at the time.

The counsel for the plaintiff in error place their objection on the ground that this testimony tended to create a prejudice against the Company and thereby increase the damage. This may be true, though it does not appear to have been offered for that purpose; but if the testimony was competent to show that the Company had employed a reckless and incompetent engineer, as it clearly was, that being a material point involved in the suit, it cannot be said that it should have been excluded. Being competent upon the issue, it is not to be presumed that it was perverted to an improper purpose before the jury.

The last objection urged against the judgment is, that the damages assessed by the jury were excessive. The amount of the verdict considerably exceeded the value of the animals actually proved, though there was evidence which might have justified the jury in somewhat exceeding that value. But it is plain that the jury gave exemplary damages, in some amount; and the question is whether the case justified a verdict of that character.

The evidence was sufficient to justify the jury in believing that the railroad track was in an improper condition, and unfit for the exigencies which may often arise in running such dangerous engines; being covered with grass, so as to prevent their prompt stoppage, when necessary—that the cars were not supplied with the *brakes* and fixtures necessary to their safe running and speedy stoppage; and the injury here complained of is excused on these grounds—that the conductor was a lad of seventeen years of age, and giving no attention to his duties when the collision took place; that the engineer was a man of intemperate habits, reckless, and unfit for the responsible trust confided to him; that either by his wanton conduct, or by the improper manner in which the cars were furnished with the necessary appliances for prompt stopping, (either or both of which the jury had the right to believe from the evidence,) the locomotive was not stopped, as it could and ought to have been, on a properly fitted and well-conducted railroad; that no proper exertion was made to stop the locomotive in time to avoid the injury, and that the engineer appeared reckless of the stock. No fault is imputed to the plaintiff, except that he did not keep his stock from the track, where they casually were without his knowledge.

Upon the evidence conducing to show this state of things, the court, by the consent of both parties, instructed the jury as follows:

"Every man in the management of his own affairs, shall so conduct them as not to injure others; this duty was a mutual one, binding alike on the plaintiff and defendants; and if the plaintiff has failed to observe this duty, and the defendants be guilty of a like breach, the plaintiff has no right to complain, and cannot recover, unless, notwithstanding the conduct of the plaintiff, the

injury would not have happened had it not been for the wanton and wilful negligence and misconduct of the defendants."

The question of gross negligence and wanton misconduct was thus fully presented to the consideration of the jury.

Let us see what are the rules of law governing the conduct of the defendants in the prosecution of their business.

In the first place, the company is responsible for the tortious acts of its agent, whether the act was one of omission or commission, whether negligent, fraudulent, or deceitful. *Philadelphia and Reading Railroad Co.* v. *Derby*, 14 How. 486. And the same doctrine is held by the same court, in *Stokes* v. *Saltinstall*, 13 Peters, and is applied to an incompetent or careless agent. *Railroad Co.* v. *Keary*, 3 Ohio, 206.

In the case first cited, the Supreme Court of the United States say, in a case involving the liability of a railroad for an injury, by the neglect of their agent : " Where carriers undertake to carry persons by the powerful and dangerous agency of steam, public policy and safety require that they be held to the greatest possible care and diligence. And whether the consideration for such transportation be pecuniary or otherwise, the personal safety of the passengers should not be left to the sport of chance or the negligence of careless agents. Any negligence in such cases, may well deserve the epithet of *gross.*" 14 How. 486. And again : "Nothing but the most stringent enforcement of discipline, and the most exact and perfect obedience to every rule and order emanating from a superior, can insure safety to life and property. The entrusting such a powerful and dangerous engine as a locomotive, to one who will not submit to control and render implicit obedience to orders, is itself an act of negligence, the '*causa causans*' of the mischief. . . . . Any relaxation of the stringent policy and principles of the law affecting such cases, would be highly detrimental to the public safety." Ib. 487.

Again, it was the duty of the company to provide engines properly constructed and in good order, with suitable fixtures for preventing injuries likely to occur from the nature of their business ; and to use " such care and diligence in using their locomotive upon the road as would be exercised by a skilful, prudent, and discreet

person, having a proper desire to avoid injury to property along the road;" *Baltimore and Susquehanna R. R. Co.* v. *Woodruff*, 4 Maryland, R. 257; to provide a safe track, a safe engine and cars, and a suitable number of competent and faithful men to carry on the work. *Hegeman* v. *Western R. R. Co.*, 16 Barb. 356; 2 Denio, 441; 3 Ohio R. 206; 2 Cushing, 540.

Again, it is a well settled rule of law and highly applicable to engines and locomotives on railroads, that persons having charge of instruments of great danger, are bound to manage them *with the utmost care*. *Dixon* v. *Bell*, 5 M. & S. 198; *Lynch* v. *Nurdin*, 1 Q. B. 29; 41 E. C. L. R. It is well said by the Supreme Court of Ohio, that "No one has the right to put in operation forces calculated to endanger life and property, without placing them under the control of a competent and ever active superintending intelligence. Whether he undertakes it or procures another to represent him, the obligation remains the same, and a failure to comply with it in either case, imposes the duty of making reparation for any injury that may ensue." 3 Ohio State R. 209.

And in this, as in all other cases of agency, the rule is, that "*the principal holds out his agent as competent and fit to be trusted, and thereby he, in effect, warrants his fidelity and good conduct, in all matters within the scope of the agency.*" Story on Agency, 452.

The question of gross negligence or wanton mischief was distinctly submitted to the jury, and was a material part of the case; and whether we consider it with respect to the bad condition of the track and the absence of appliances and fence necessary for its safe operation, or the unfitness and recklessness of the engineer, it is plain that the jury were at liberty from the evidence, to find that the injury was occasioned either by the gross neglect of the company, or the wanton mischief of the engineer. That was a question which they had the right to determine, and their verdict cannot be disturbed on that ground, when the evidence conduces to support it in any fair view in which it can be taken, especially when the testimony is conflicting, and the credit of witnesses is involved. Under such circumstances, their finding settles the fact. 14 How. 486; *Lynch* v. *Nurdin*, 1 Q. B. 29; 41 E. C. L. R.; *Beers* v.

*Housatonic R. R. Co.*, 19 Conn. 566.   Lord Denman says, in *Lynch* v. *Nurdin*, "It is a matter strictly within the province of a jury deciding on the circumstances of each case."

And it is immaterial whether the jury thought there was gross neglect or wilful mischief.   The rules above stated apply equally to either state of the case, and would warrant the jury in finding exemplary damages, if the circumstances of neglect or aggravation tended to justify it, and they thought fit to award it.   In the last case cited, Lord Denman says, "Between wilful mischief and gross negligence the boundary line is hard to trace: I should rather say, impossible.   The law runs them into each other ; considering such a degree of negligence as some proof of malice." *Lynch* v. *Nurdin*. And upon the same principle, the numerous cases, whether of gross negligence or wanton wrong have proceeded, in which exemplary damages have been awarded.   For it matters but little to a party injured, whether the wrong be done with a malicious intent, or by gross violation or neglect of duty.

It must be taken, then, that the verdict of the jury settles the question, that there were circumstances of aggravation tending to show gross negligence, or a wanton and reckless disposition to injure or destroy the plaintiff's property.   And it is well settled, that if the property was destroyed under such circumstances, exemplary damages may be awarded.   Sedgwick on Dam. 42 *et seq. ;* Ib. 488, 489; 3 Graham & Wat. on New Trials, 1121 *et seq.*, and cases there cited.   And the damages allowed in this case do not appear to be enormous.

Upon a careful consideration of the whole case, in view of its great importance to the community, we are of opinion that the judgment is correct; and it is accordingly affirmed.

A re-argument was asked on so much of the opinion as relates to vindictive damages, but it was refused.