# DECISIONS

OF THE

# SUPREME COURT OF FLORIDA.

## JANUARY TERM, A. D. 1886.

SAVANNAH, FLORIDA AND WESTERN RAILWAY COMPANY, APPELLANT, vs. J. H. GEIGER, APPELLEE.

1. The common law in so far as it requires the owner of live stock to keep them off the premises of another and renders him liable to the owner of such premises for damage done by such stock, is not in force in Florida.

2. Cattle, horses and other live stock running at large are not trespassers when they go upon the track of a railroad company, nor are their owners liable for damage resulting to the company from their going upon the track and an engine or train of cars running upon them.

3. The right of a railroad company to the use of its track is nothing more than the right of every other land proprietor in the actual use and occupancy of his land and does not exempt the company from the duty enjoined by law upon every person so·to use his own property as not to do any unnecessary injury to another.

4. A railroad company is liable for killing or injuring cattle or other live stock upon its track by its train whenever such killing or injury is the result of negligence upon the part of the agents operating the train. The fact that the owner of the live stock permits them to run at large does not constitute contributory negligence.

5. Negligence upon the part of the railroad company is the basis of the right of the owner of the live stock to recover, and it must be averred in the declaration, and be proved.

6. In an action by an owner of live stock against, a railroad company for killing or injuring the stock by its train, proof of the killing or injury is not of itself *prima facie* evidence of negligence upon the part of the company or its agents. To make out a *prima fa-*

*cie* case of negligence there must at least be evidence of circumstances, from which a presumption arises that the stock would not have been run upon by the train but for want of care on the part of those operating it.

7. The Legislature may provide that proof of the killing or damage to live stock by a railroad train or engine shall be *prima facie* evidence of negligence on the part of a railroad company or other person operating the railroad.

8. Where under the circumstances of the killing or injury it could have been avoided by the exercise of ordinary or reasonable care upon the part of the agents operating the train, and such care has not been exercised, the company will be liable ; but if notwithstanding the exercise of such care the killing or injury would be unavoidable the company is not liable.

9. Though owners of cattle and other live stock have the legal right to turn them out to range, yet in doing so they assume the risk of any damage which may result to the stock from their going upon a railroad track and being run upon by a train, when the circumstances are such as to render running upon them unavoidable notwithstanding the use of reasonable care by the person operating the train to avoid it.

10. The meaning of sections one and two of "an act to provide a means for the collection of claims for cattle and other stock destroyed by railroads," (chapter 2060, acts of 1875,) is that the "affidavit of the owner or some other person acquainted with the stock killed or maimed," shall be conclusive evidence of the amount of damages sustained by the owner, and such provision is void as not providing due process of law.

11. Where the subject expressed in the title of a statute is the provision of "a means for the collection of claims for cattle and other stock destroyed by railroad," and the body of the statute declares or creates an absolute liability which did not exist prior to its passage, such new liability is not within the subject expressed in the title, and to this extent the statute is inoperative under section 14 of Article 4 of the Constitution.

Appeal from the Circuit Court for Nassau county.

The declaration, omitting the court, is as follows: "Now comes J. H. Geiger, by P. B. Bedford, his attorney, and sues the Savannah, Florida and Western Railway Com-

pany, operating a portion of their line, commonly known as the Waycross Short Line, from Jacksonville to Waycross, Georgia, a portion of said road lying in said county of Nassau, said Short Line not being fenced, for killing ten head of cattle, two head of sheep and five head of hogs in said county of Nassau, to-wit: about the first day of November, 1884, the value of said cattle, sheep and hogs being one hundred and fifty-four dollars; and the plaintiff claims one hundred and seventy-nine dollars damages for his property so killed, and the further sum of twenty-five dollars."

The plaintiff filed, on the day of the filing of the declaration, an affidavit in which he deposes that the appellant " is indebted to him in the sum of one hundred and twenty-five dollars for ten head of cattle killed by said company, running their train through Nassau county, (and giving the marks and brand of the cattle,) which killing of said cattle damaged said affiant twenty-five dollars by loss occasioned from the loss of the use of said cattle; also two sheep worth four dollars, (giving their marks,) and for five head of hogs worth twenty-four dollars, (giving their marks,) all of which affiant claims damaged him in the sum of $179, besides the interest."

The railroad company demurred to the declaration as " not sufficient in law," and "in that it does not allege that the damage therein complained of is due to any negligence, default or misconduct on the part of the defendant, its officers, agents or employes."

The Circuit Court overruled the demurrer and the company pleaded " not guilty."

There was a trial by jury and verdict for the plaintiff, assessing his damages at $146, and judgment accordingly.

The Circuit Judge charged the jury, at the defendant's

request, that a railroad company is not required by the laws of Florida to fence its track, and that failure to fence its track should not be considered negligence on the part of the company; and that the measure of damages in cases where the animals were killed is the actual market value of the same at the time of the killing.

He also charged of his own motion that " the fact of killing an animal of value by the railroad company's engine has been made prima facie evidence of negligence on the part of the company, under the statutes of this State, which presumption may be rebutted by evidence on the part of the defendant company."

The defendant also requested the Judge to give the jury the following several instructions:

" 2. To entitle the plaintiff to recover from a railroad company damages for killing or maiming domestic animals in this State, it is necessary for him to prove that the killing or maiming was the result of the willful or negligent misconduct of the defendant, its officers, agents or employes."

" 3. The mere fact of injury is not a presumption of willful or negligent misconduct against the company."

" 4. To enable the plaintiff to recover for damages it is necessary for him to prove that he used ordinary care to avoid the injury, or else if he did not observe ordinary care that the absence thereof did not conduce to the injury."

" 6. The burden of proof as to all acts or state of facts as causes of liability, is on the plaintiff in such cases."

" 7. The fact of killing an animal of value by the company's engines is not prima facie evidence of negligence on their part."

Each of these instructions was refused by the Judge, and the defendant company excepted, as it did to the charge

stated above to have been given by the Judge of his own motion.

The other facts are sufficiently stated in the opinion of the conrt.

*Fleming & Daniel* and *Robt. W. Davis*, for Appellant.

At common law a railroad company is not bound to fence its track, and, in the absence of statutory provisions to the contrary, it live stock go upon an uninclosed railroad the company are only bound to the use of reasonable or ordinary care to avoid injuring the same, and if such stock are injured thereon without the negligence of the company, the owner cannot recover. If the company be negligent and the owner likewise contributing to the injury, he cannot recover. Rorer on Railroads, 614; Rorer on Railroads, 575, sec. 5, 633-4, 1388, 1880, 1881; 1 Redfield on Railways, 489, sec. 8; 1 Redfield on Railways, 501, sec. 31, and numerous cases cited.

A railroad company in the running of its trains is in the lawful pursuit of a calling, and before it can be required to pay for damaging animals upon its track it is necessary for the claimant to prove that the damage resulted from its willful or negligent misconduct.

The killing of stock is not a benefit to the company. It cannot appropriate the animal killed to its use. It is frequently damaged in the operation by having its trains thrown from its tracks and wrecked. It cannot be claimed that the company is under any obligation to pay for the stock killed on any principle analogous to that requiring one to pay for goods of another appropriated to his use. If the company is required to pay for the damage done it is solely on the principle of a fine for wrong-doing, for misconduct, for sins of omission if not of commission; a pun-

43

ishment for a crime committed; a warning against future crimes; an example to law-breakers.

A railroad company, engaged in a legal occupation, in the performance of public duty for which it was organized by law-abiding citizens, and chartered by the State, the character of its duties and operations everywhere recognized, so long as its officers, agents and employes are efficient and diligent in attention to the business for which the company was organized, and guilty of no misconduct, cannot be charged with wrong-doing and punished by a fine for the happening of something which it could not have prevented by any possibility. Everyone knows that, be as careful as they may, it would be absolutely impossible for the engineers to run their trains so as to make half the time now universally required by the travelling public without occasionally killing a domestic animal. And yet the law considers the efficient operation of railroads of so much more importance than the avoiding of injury to live stock that the company is held to be under no obligation in law to slacken the speed of trains or to make other efforts to avoid injury when they are seen feeding by the wayside. Rorer on Railroads, 1380, and cases cited.

And yet to require the company to pay for stock killed through no fault of theirs, would be equivalent to, and in fact, a punishment by way of a fine.

In order to convict a company, as in the case of an individual, and punish it for a crime committed, it is necessary that it be charged with and proven guilty of all facts essential to the committing of the crime. It being known that the company, in the running of its trains, is in the performance of its duty under the law, and that in the running of its trains, be it as careful and efficient as it may, stock will frequently be killed, it cannot be that the simple charge that stock was killed by a train running upon its

road will be sufficient even to put it to defence further than demurring. And yet nothing more than this was charged in the trial of this case in the court below, and a demurrer was overruled. Nothing more than this was attempted to be proved, yet the charges asked by the defense as to the necessity for other proof were refused, a verdict rendered and a judgment entered up against the defendant.

The mere fact of injury is not a presumption against the company ; it is not *prima facie* evidence of negligence on their part. The plaintiff must allege in his pleadings and prove negligence, or willful misconduct on the part of the company. The burden of proof as to all things necessary to cause liability is on the plaintiff. Negligence or willful misconduct is *the essential element* of responsibility in such cases. It is not for the killing, but for the misconduct, willful or negligent, that the fine is imposed, the punishment given. Rorer on R. R., 697, sec. 7 ; Rorer on R. R., 138, 139, 190 ; Pierce on R. R., 428 ; Redfield on R. R., 485-6-7-8-9, 501.

In States where companies are required to fence their tracks, the failure to fence is a violation of law, and when stock is killed thereby the company is liable, because an injury is inflicted, a damage done, through the default of the company as to its fence, and then the question of criminality on some other ground is immaterial, but in all cases it is necessary that there should be a violation of duty causing the injury, or there is no responsibility therefor.

The fact that most of the States whose courts have most frequently passed upon the question in this case have statutes requiring railroad companies to fence their roads makes it more difficult to find decisions of the courts on some of the questions before us.

The plaintiff's counsel and the court below agree with us, we believe, as to the law on the subject, excepting only

as to the construction of the statute under which plaintiff claims to have brought the action. Sections 1 and 2, chapter 2060, Acts of 1875.

The statute, as we understand it, attempts to hold all railroad companies in this State liable for damages to live stock on their roads absolutely, and prescribes an *ex-parte* method of proving the amount of the damage by the affidavit of one witness, who cannot be disputed. The affidavit is conclusive proof as to the justice and amount of claim, precluding any possible defense by the company.

If this is not the proper construction of the statute, we will be at a loss to understand how the Legislature, meaning to say something else, said what it did. We are aware that it is the duty of the courts to construe a statute so as to make it constitutional, if this can be done with reasonable regard to the language used, but we do not understand that the English language should be stretched beyond recognition in this endeavor. As we understand it, the language used by the Legislature provides that a railroad company shall be required to pay for all damage to stock killed on its track, without regard to circumstances. No defense can be made. The amount is stated by an affidavit, which fixes the amount, and is sued on as a bond, only more effectually. It either makes the company liable absolutely, or it doesn't make it liable at all. The affidavit is conclusive, or it amounts to nothing.

It singles out a particular kind of corporation for hostile legislation, fixing on it a liability and a criminality for a certain thing which is not criminal nor cause for liability to another.

As to the constitutionality of the method of "establishing" damages by affidavit beyond dispute, we will not argue. The appellee admits that if it fixed beyond question the claim—"established" the damage—it would render the

act unconstitutional. . He construes it to be simply matter of pleading, if we understand his position aright, but we confess that we have not been able to fully fix in our minds just how he does construe this part of section one.

To us it appears clear that this alone destroys the statute. But we leave it to accommodate the appellee.

We will only quote from 2d Florida Reports, 102: " Where consequences in violation of common right, common reason, and the principles of justice arise even collaterally out of a statute, it is void *pro tanto*."

We think this applies to the whole of sections 1 and 2, of the act considered.

In the interpretation of this act we think we can find assistance by a very close consideration of the case of Zeigler vs. S. & N. Railroad Company, reported in 58 Ala., pp. 594-600, and incidentally of one or two other cases in the reports of that State. These decisions are particularly interesting to us because they were made under a statute nearly related to the statute we have under consideration at present, which provided " that from and after the passage of this act, all corporations. person or persons, owning or controlling any railroad in this State, shall be liable for all damages to live stock or cattle of any kind, caused by locomotives or railroad cars."

This case is so full of law on the subject, as we understand it, that we will not attempt to enlarge on it, but ask that it be carefully considered, as if we had incorporated it in this brief.

The court in the decision, in 58 Alabama, says: " An act which fixes absolute liability on a corporation to make compensation for injuries done to property, in the prosecution of its lawful business, without wrong, fault or neglect on its part, when under the general law of the land no one else is liable under such circumstances, does not provide

' due process of law ' under section 7 of the Bill of Rights, and it is therefore void."

In the Constitution of the United States we find that " no person shall be deprived of life, liberty or property without due process of law." Article 5 (Amendments.)

And the Constitution of Florida makes the same provision. Section 9, Article I, (Declaration of Rights.)

As particularly applying to the ruling on the demurrer we would cite 53 Ala. R., p. 647, which says : (they had virtually the same as our statute before them, except as to the affidavit method of " establishing ")—" The complaint in an action against a railroad company, to recover damages for the killing or injury to live stock by its train, is demurrable unless it avers that the injury was negligent or the result of negligence on the part of defendant, its agents or servants."

But, says appellee, if it is necessary for me to prove negligence on the part of the company, I cannot do this because I did not see the cattle killed ; it will work a hardship on me.

The law is the law, work a hardship on whom it may. But, on whom will the law work the greater hardship? Even if it were settled that the killing made out a *prima facie* case, and that it devolved on the defendant to prove due-diligence in defence ? This would be asking an impossibility as well as working an injustice. Is it fair to say that the proof of something in itself admittedly innocent, or at most not criminal when proven shall raise a presumption of guilt to be removed by rebuttal, but if not rebutted, shall warrant conviction ? It is true that the plaintiff could not always prove negligence where it existed, owing to the fact that the cattle are not always seen when killed. It is equally true that not even a railroad company should be considered and held in a court of law guilty of

misconduct, negligent or willful, until it has been proven so. While the owner could not always prove negligence where it existed, the company could never prove due diligence no matter how diligent might be all of its employes. In Justices' Courts, where at least nine-tenths of these cases are brought, there are no written pleadings. The company is summoned to defend a suit. It has no means of ascertaining such facts concerning the claim as would be absolutely necessary to enable it to defend successfully by taking the deposition of or summoning as witnesses its engineers and other employes who saw the killing. Or say we take a case in the Circuit Court where the pleadings. are written, the present case, for instance, how could the defendant possibly prepare to defend on the ground that it used due diligence ?

The owner knows his cattle, perhaps by the flesh marks, or may be by the mark and brand, or more likely by both. He can swear to the facts as he knows them. The engineer who was on the engine and saw the cattle killed would not be a practicable witness in this case because he could not identify the cow sued for as the cow which ran upon the track immediately in front of his engine, which was pulling the fast mail train from behind the wood rack. Even if each engineer on the road stood ready to swear that he used his utmost diligence to prevent the killing of stock, it would be inadmissible, unless his testimony could be connected with the particular animal in question. So far as the company is concerned, the law might practically as well be absolute in its fixing liability as to place on them the burden of proof to rebut the presumption of guilt raised by the killing.

*T. B. Bedford* for Appellee.

This suit was brought by the plaintiff to recover damages for killing ten head of cattle, two head of sheep and five head of hogs, under sections 1, 2, 3 and 4, McClellan's Digest, page 856, which statute we claim changes the Common Law Rule in such cases as to damages, and that all the plaintiff has to prove is the killing, the value of the property and ownership, which make a *prima facie* case which entitles him to recover, unless the defendant rebuts it with satisfactory evidence that the killing was the result of an unavoidable accident. Redfield on Railways, vol. 1, page 493 ; ib., 494, sec. 13 ; ib., 498 and 499.

Compare the Judge's charge on page 18 of the Record with the statute on page 856, McClellan's Digest, and if it is good law the charge was proper.

Negligence—proof of whom on.

Railroad companies should exercise the utmost care and diligence in the exercise of their privilege to avoid doing injury to others. Redfield on Railways, page 493.

The inference of negligence or no negligence is one of fact for the jury. Ibid, page 494, sec. 13.

But 'the onus of proof is changed ' by the statute, and when stock is killed the law now imputes negligence to the company *unless* it can show that the damage results from *unavoidable accident*.

This is putting the *onus* of proving negligence where it should be, for the company has two witnesses present, experts, at every killing, while plaintiff is at *home* following his daily business. 1 Redfield, pages 498, 499 and 501.

In other words, if the plaintiff is not in fault the company is responsible. 1 Redfield, page 498, sec 24.

Mr. Justice Raney delivered the opinion of the court :

This is an action brought by the appellee to recover of

the appellant for cattle, sheep and hogs killed by a train upon the latter's railroad track.

At the common law, every entry upon another's land (unless by the owner's leave or in some particular cases which it is unnecessary to mention,) was treated as an injury or wrong, for satiafaction of which an action of trespass would lie, the *quantum* of the satisfaction being determined by considering how far the offence was willful or indiscreet, and by estimating the value of the actual damage sustained. This law styled every unwarrantable entry on another's soil a trespass *by breaking his close*, and the writ commanded the defendant to show cause wherefore he had broken it. In the eye of the law every man's land was inclosed and set apart from his neighbors's, either by a visible and material fence as one field is divided from another by a hedge, or by an ideal invisible boundary existing only in contemplation of the law as when one man's land adjoins another's in the same field. Every such entry or breach of a man's close carried necessarily along with it some damage or other, for if no other special loss could be assigned, still the words of the writ itself specified one general damage, the treading down and bruising his herbage. A man was moreover answerable not only for his own trespass but that of his cattle also, for if by his negligent keeping they strayed upon the land of another (and much more if he permitted it or drove them on) and they there trod down his neighbor's herbage or spoiled his corn or trees, this was a trespass for which the owner must answer in damages; and the law gave the owner of the land in such cases a double remedy by permitting him to distrain the cattle thus *damage feasant* till their owner should make him satisfaction, or else by leaving him to the common remedy of trespass *quare vi et armis clausum, &c.* 1 Blackstone Comm., 208, 211.

It is material to inquire at this point whether or not the above principles of law which unquestionably require an owner of stock to keep them off another's land in so far as the rights and property of such other person are concerned, are as to cattle and other stock of the kind mentioned in the declaration, still in force in Florida.

So early as the year 1823, at the second session ;of the Legislative Council of the Territory, a statute regulating fences was enacted to take effect from and after the first day of the then ensuing May. After prescribing by its first section the dimensions of the fence, it provided, by section 2, that if any trespass or damage should be committed on any garden, orchard, plantation or settlement, not fenced or inclosed as prescribed, by the breaking in or straying of any cattle, horses, sheep, goats or swine, the owner thereof should not be liable to answer for or make good any damage or injury happening or committed by reason thereof; and further that in case any person should kill, maim or hurt any such stock so straying or breaking into any such place or settlement not so fenced or inclosed, he should answer and make good to the owner of the stock all injury and damage sustained thereby; and, by section 3, imposing upon any person not having such a lawful fence, a penalty for fixing in his inclosure any canes, stakes or anything that might hurt or kill such animal. In 1824 this act was amended in so far only as to make some changes in the requisites of a " worm fence." In 1885, a period subsequent however to the accruing of the alleged cause of action, an act (chapter 3619) practically revising the above legislation was approved, the first section of which prescribes what shall be deemed a lawful fence, and the second and third sections of which are in effect a re-enactment of the second and third sections of the act of 1823. In 1871 it was made a misdemeanor, by chapter 1846, for one, not

having a sufficient fence to prevent the intrusion of animals, to kill, wound or disfigure any animal of another person in attempting to expel it from his premises.

In 1823, a statute, reciting that a practice hath hitherto prevailed of driving large quantities of neat cattle from the several adjoining States by citizens thereof, and that it was consistent with justice and good policy that all persons who enjoy the benefits and advantages of a State or Territory should contribute and share with the good people thereof the expense and labor of supporting and defending the same, was enacted which taxed such cattle *per capita*, its provisions not applying to persons actually "removing into" the Territory and bringing their cattle with them ; (acts of 1823, p. 111,) and in 1835 it was made unlawful for a non-resident owner of cattle or stock to drive them upon lands within the Territory for purposes of grazing, and this upon penalty of forfeiture and sale.   Duval Comp., 54, 60 ; McC's. Dig., 50.

In 1828 an act was passed which punished by fine any one who should drive, entice away or remove any cattle from a pasturage or range, without leave of the owner of the cattle, and in 1829 it was modified so as to apply only to driving them more than five miles from the range or place where cattle most usually graze.   Thomp. Dig., 136. And an act of 1832 punished any one who *willfully* drove, removed or enticed away any cattle from a pasturage or range.   Thomp. Dig., 507.   And by an act of 1868, (p. 423, secs. 9 and 10, McC's. Dig.,) it is declared unlawful to drive another's cattle directly from their own range or more than five miles from the home of their owner without his permission.   McC's. Dig., 423.

In 1877 "an act for the better protection of cattle in this State" was passed.   It empowers each Board of County Commissioners to lay out the county into cattle districts,

and for the appointment of cattle inspectors whose duty it is to inspect and record the marks and brands of all cattle driven or shipped from their respective counties, together with the name of the person shipping, and the time, place and vessel of shipment, and making it the duty of any one intending to drive or ship cattle from a county to notify an inspector where and when they will be concentrated for shipment, and prohibiting any purchaser from changing the marks and brands of cattle before having the change recorded in the office of the Circuit Court Clerk, and requiring a record of marks of cattle driven from one county to another for the purpose of changing their range, or driven there and sold as beef cattle, and imposing suitable penalties for a violation of the act.

The estray laws now in force, like the original enactment of 1823, define estrays and punish by fine, and subject to an action of damages, any one who vexatiously or maliciously takes up as an estray any animal named in the act contrary to its true intent and meaning. There has also been other legislation, needless to mention, in the interest of persons owning cattle on the range.

Nothing is clearer than that the purpose and effect of all this legislation were not only to change the common law and require of every landholder or other person that he should fence out his neighbor's, and every one else's stock, if he desired protection against damage from them, but also to establish and protect a right in resident owners of stock for their cattle and other domestic animals to range and graze on all uninclosed lands free of charge, and without any liability for any damage resulting from their going upon or grazing on any lands whatsoever not inclosed by a lawful fence. No special interest is of much if any more moment to our State, and none elicited earlier legislative attention than stock raising.

Cattle, hogs and sheep, if not all other kinds of live stock, not known to be dangerous, have been allowed, and accustomed at all times and in all parts of our State, since at least soon after its acquisition from the Spanish crown, to run at large and graze on all lands not inclosed by a fence. This has prevailed not only throughout the rural districts but also in the towns, although it is true that lately in some of the latter to a limited extent, and possibly entirely in a few instances, it has been restrained by local ordinance. A different policy than that which has. prevailed would have proven ruinous to the important stock interests of different sections of the State; and the general legislation of later years has been no more favorable to such a policy than was that of the earlier period of our history and this, too, although in a few agricultural districts a financial deterioration has caused most of the fences which once protected large and valuable plantations to entirely disappear. In States having similar stock interests and customs and regulations to those indicated, it has been held that the common law indicated above as to cattle has been superseded either as not suited to the institutions of the people or as repugnant to the legislation. Vicksburg & J. R. R. Co. vs. Patton, 31 Miss., 156 ; Nashville, &c., R. R. Co. vs. Peacock, 25 Ala., 229 ; Tripp vs. Hasell, 1 Strob, p. 173 ; Kerwhacker vs. C. C. & C. R. R. Co., 3 Ohio St., 172 ; Seeley vs. Peters, 5 Gillman, 130 ; Gorman vs. P. R. R. Co., 26 Mo., 441 ; Wagner vs. Bissel, 3 Iowa (Clarke), 396 ; Heath vs. Collenback, 5 Ibid, 490.

Such being the policy of our laws as to live stock—a policy which makes them free commoners—the next inquiry is whether any special exception from or against it has been created in favor of railroad companies. The general railroad law (chapter 1987, approved February 19, 1874,) gives to every corporation formed under it the right.

to purchase, hold and use, all such real estate as may be necessary for the construction and maintenance of its road and the stations or other accommodations necessary to accomplish the objects of its incorporation, and to lay out and construct its road, and to take and convey persons and property over its road by the power and force of steam, or by any mechanical power, to receive compensation therefor and do all the business incident to railroad business, and regulate the time and manner in which passengers and property shall be transported, and the compensation to be paid therefor. The 27th section provided that if any person should ride, lead, or drive any horse, or permit any animal belonging to him to stray, stand, lie or walk upon any railroad without the consent of the corporation or party having control of such road, he should for every such offense forfeit a sum not exceeding ten dollars and should also pay all damages sustained thereby to the company or party aggrieved. This section repealed by implication the former statutes providing for payment by railroad companies for stock killed, and it is unnecessary to mention them. At the next ensuing session of the Legislature this section was expressly repealed by chapter 2059, approved February 13, 1875, passed solely for this special purpose, and thus was removed any special exception which may have been created in favor of railroad companies by said section.

There is no statute here which *requires* a railroad company to fence its track, and imposes on the company as a penalty for not doing so a liability for all stock killed or injured.

A corporation owning a railroad has certainly the right to own land and operate a railroad upon it, and to run its trains at such speed as its business requires and is consistent with the safety of passengers and freight, the condi-

tion of the roadbed and all appliances necessary and proper in the operation of a railroad being considered. Vicksburg and Jackson R. R. Co. vs. Patton, 34 Miss., 156; Raiford vs. R. R. Co., 43 Miss., 239. " As to the rate of speed at which trains may be propelled it is dependent on several considerations, the condition of the road, the usage of railroads generally, the amount of property and passengers offering for transportation; but the principle which underlies the subject is that the rate of speed must be reasonable, such as is consistent with the safety of the property and passengers in their care. Whatever rate be adopted, the company are in no degree to relax efforts to protect cattle from injury. If the convenience and business of the public demand a rapid transportation, they are not restrained from meeting the requirement because the danger to stock from a fast train is greater than from a slow one." 46 Miss., 581.

After the repeal of the 27th section alluded to, there was nothing left in the railroad act which required stock owners to keep up their stock as against railroad companies; and the acquisition by a railroad company of a piece of land, and its use by operating thereon a railroad, do not under the laws of this State impose upon a stock owner a legal duty to keep his stock up, or in other words deprive him of the right to turn out his stock to range as free commoners. The company has the right to carry on its business upon the land as did its predecessor in ownership his avocation, but with the same relation to the rights of the stock owner as to uninclosed lands. If cattle go upon the land pending the company's ownership, they are not trespassers in the eyes of the law, nor were they when its predecessor held it. No change has been made in this respect by the change of ownership. Alger vs. M. & M. R. R. Co., 10 Ia., 268; Simkins

vs. C. & G. R. R., 20 S. C., 259 ; 43 Miss., 239. Persons who incorporate under our railroad statute do so with knowledge of the rights of others, and the rule which claims of one person that he shall so use his own property as not unnecessarily to injure that of another, is as binding upon artificial as it is on natural persons. Ill. C. R. R. Co. vs. Middlesworth, 46 Ill., 494. The owner of stock of course takes notice of the rights of the railroad company ; and his stock wander upon the range with a knowledge on his part of the dangerous character of the company's business, and that he runs the risk of all unavoidable accidents and damage to them from the train. Kerwhacker vs. C. C. R. R. Co., *supra*, 10 Ia., 268 ; 43 Miss., 239 ; 46 Miss., 573.

The grant of a right to one is not to be presumed as intended to take from another class a right previously established either by law or custom in the latter's favor. The repeal of section 27 removes the exception its enactment had made in favor of railroad companies as to stock legislation.

Whenever one of two persons having such rights claims that he has been damaged in his property by the other, and that he is entitled to have such damages made good, and the other denies such claim on the ground that what he did was in the exercise of his own right, the test of such right of recovery, in the absence of a willful intent to injure, is whether the one who has done the injury has, considering all the circumstances of the particular case, taken in the exercise of his own right that care which the law requires he shall take against injuring the other in his property. 3 O. St., 172. A failure to observe this care is called negligence ; negligence is the basis of the injured party's right to recover in such cases, and whether a railroad company is liable for killing or damaging stock by

running its engine or train over or against them while on its track, is a question of negligence. Balcom vs. D. & S. R. R. Co., 21 Ia., 102; 10 Ia., 268, and other authorities *supra.*

Unless the statutes have changed the rule, or there is something in the very nature of such a killing or injury by a railroad train making the rule inapplicable, the declaration must allege and the proofs must show that the injury was occasioned by the company's negligence, and the burden of proof is on the plaintiff. Alger vs. R. R. Co., *supra;* Jacksonville Street R. R. Co. vs. Campbell, *supra,* 175.

If, under all the circumstances of a particular case, as shown by the testimony, it appears that the killing or injury could not have been avoided by the exercise of reasonable care on the part of the agents of the company operating the train, there can be no recovery. If, on the other hand, it is shown that had such agents exercised reasonable care under the circumstances surrounding them they could have avoided running against the stock and injuring it, but that they did not do so, the company is guilty of negligence and liable for the damage. R. R. Co. vs. Patton, *supra* ; Kerwhacker vs. R. R. Co., *supra* ; Alger vs. M. & M. R. Co., 10 Ia., 268. If there is contributory negligence upon the part of the owner of the stock he cannot recover, but permitting them to go at large does not, of itself, though followed by their going on the track, constitute contributory negligence in him, or make them trespassers under our laws. 10 Ia., 268 ; S. C., 259 ; 43 Miss., 259.

Is it true that there is in the nature or necessary circumstances of every killing or injury of stock by railroad engine or train something making it an exception from the general rule which requires of the plaintiff both an allegation and proof of negligence ? In South Carolina, in Dan-

44

ner's case, 4 Rich., 329, (which is not before us, but is reviewed in Jones vs. C. & G. R. R. Co., 20 S. C. Repts., and 19 A. & E. R. R. cases, 459) the rule laid down according to Jones vs. C. & G. R. R. Co., is that the killing of stock by a railroad train being proved, the law presumes the injury was done through the negligence of the railroad company until the contrary is shown. It is said in Danner's case, says the opinion in Jones vs. C. & G. R. R.: "That the company did not produce witnesses to show how the damage occurred, nor explain why they omitted to do so, tends to induce the belief that they could make no defence. They had the witnesses under their control," and, after referring to the possible absence of the plaintiff, it proceeds: "When a party is charged with an act or declaration which may subject him to an action, and does not deny it, his silence is construed into an admission. The same construction may be put on a party's omission to offer testimony in his defence when it is in his power to produce witnesses who might exculpate him." The principle upon which the case of Danner is stated by the Chief Justice in Jones' case to have turned, is "the fact that it was in the power of the defendant alone to explain and he failed to attempt it." The cases said to be relied on by the court in Danner's case, are Leame vs. Bray, 3 East., 593; Weaver vs. Ward, Hopk., 134, which is not at our command; Christie vs. Griggs, 2 Campbell, 79; Piggott vs. E. C. R. R. Co., 54 Eng. C. L., 228; Ellis vs. P. &. R. R. R. Co., 2 Iredell, 140. Do they support it? Leame vs. Bray was an action of trespass *vi et armis* against the defendant for driving his chaise against plaintiff's vehicle, drawn by two horses, on the highway, by means whereof plaintiff's driver was thrown out, and his horses ran away with the vehicle, and plaintiff for the preservation of his life jumped while the horses were running and fell upon the ground and fractured

his collar bone. It happened on a dark night and was owing to the defendant driving his chaise on the wrong side of the road, and the parties were unable to see each other; but had defendant kept his right side of the road there would have been ample room for the carriages to pass each other. The sole question involved in the case as reported, is whether trespass or case was the proper action, and it was held that trespass was. There is nothing in the case as reported indicating that anything said by any of the judges could have been uttered with reference to a question of proof or evidence of negligence. In Christie vs. Griggs, the plaintiff, a pilot, was traveling to London on a stage which broke down and he was greatly bruised. Having proved that the axle-tree snapped asunder at a place where there was a *slight* descent, and that he was in consequence precipitated from the top of the coach, and that the bruises he received confined him several weeks to his bed, he rested his case. · The opinion in this case, by Mansfield, C. J., at *nisi prius* states that " the plaintiff has made a *prima facie* case by proving his going on the coach, the accident, and the damage he has suffered. It now lies on the other side to show that the coach was as good a coach as could be made, and that the driver was as skillful a driver as could anywhere be found. What other evidence can the plaintiff give? The passengers were all probably sailors like himself, and how do they know whether the coach was well built or whether the coachman drove skillfully. In many other cases of this sort it must be equally impossible for the plaintiff to give the evidence required. But when the *breaking down* or overturning of a coach is proved, negligence on the part of the owner is implied. He has always the means to rebut this presumption, if it be unfounded; and it is now incumbent on the defendant to make out that the damage in this case arose from what the law considers

a *mere* accident." In Piggott vs. E. C. R. R. Co., the thatch of a shed near the road was observed immediately after the passing of a train to be on fire, and notwithstanding every exertion upon the plaintiff's part to extinguish the fire it communicated with several other buildings and destroyed them. The wind was blowing towards the premises from the road. Against defendant's objections witnesses were allowed to testify to the falling of sparks on other occasions at this point, for the purpose, however, of ascertaining whether sparks could be thrown for so great a distance from the railroad. Other witnesses practically acquainted with the construction and working of engines generally in use on railroads, testified that the emission of sparks or ignited matter from the top of the chimney might, in a great measure, be prevented by a cap or covering of wire work or by perforated plates, for intercepting the escaping particles, though it was admitted that this would to a certain extent impede the draft and consequently diminish the power of the engine. They, however, stated that this might be remedied or the emission of sparks altogether prevented by employing engines of such power that they need not be worked to their utmost capacity, and that, in their judgment, to produce the alleged injury the engine used on the occasion in question must have been worked to its utmost; and that the danger arising from the emission of sparks might be entirely prevented by shutting off the steam on passing a spot where danger was to be apprehended. There was a verdict for the plaintiff. Upon motion for a new trial, Chief Justice Tindal, after remarking that the law requires of railroad companies, operating, as they do, agents of an extremely dangerous and unruly character, that they adopt such precautions as may reasonably prevent damage to the property of third persons near which their railway passes, said that the

evidence in this case was abundantly sufficient to show that the injury was caused by the emission of sparks or particles of ignited coke from one of the defendant's engines, and that there was no proof of any precaution adopted by the company to avoid such a mischance, and that the jury was right in finding that the company was guilty of negligence ; and after citing as parallel to the want of the precaution as to the sparks suggested by witnesses the case of one allowing a dog, known to be accustomed to bite, to go about unmuzzled, remarked: "The precautions suggested by the witnesses called for the plaintift in" this case, may be compared to the muzzle in Smith vs. Pelch, 2 Strange, 1267. The other Judges took substantially the same view, not using, however, the illustration as to the muzzled dog. The case of Ellis vs. P. & R. R. R. Co., was where the fence was proved to have been discovered to be on fire immediately after the engine passed, and some of it burned before the fire could be stopped. Plaintiff proved the engines upon the road usually had " spark catchers on the funnel," but whether they were on this particular engine at this time he did not recollect. It was held that though negligence was the gravamen of the plaintiff's case, yet when he shows damage resulting from defendant's act, which act with the exercise of proper care does not ordinarily produce damage, he makes out a *prima facie* case of negligence which cannot be repelled but by proof of some extraordinary accident which renders care useless.

The breaking of the axletree in the Christie case was itself *prima facie* evidence of negligence on the part of the owner of the coach. It was his duty to have axletrees sufficient for the purposes of his business. The breaking under the circumstances was evidence that he fell short of this duty, and that the coach was not then " well built." There is nothing in the case intimating that it is ever unne-

cessary for the plaintiff, whatever his ignorance of the nature or character of the real cause of the mishap, to go so far as to prove some fact which is of itself *prima facie* evidence of neglect or failure upon defendant's part in doing his duty. The Piggott and Ellis cases are based upon the principle that the use of well known appliances, which it is the duty of the operators of railroads to use, will, as a general rule, prevent such escape of sparks as will set fire to buildings and fences standing adjacent to the road. In all such cases the relation of the structures to the road is always established, and is always well understood or can be readily seen or learned by the agents operating the train approaching or passing them.

The nature of the South Carolina case and that before us does not properly assimilate to the four cases we have reviewed. No inherent defect is shown in anything relating to the road or train as was shown in the coach in Christie's case. The fixed relation which buildings and fences bear to the track and to passing trains, and which has enabled science and skill to provide those appliances which as a general rule prevent such escape of sparks as will set fire to and burn them has no counterpart in the uncertain and varying circumstances under which cattle may appear on a railroad track. To put the two classes of cases on a level we think it at least necessary to establish by evidence the locality on the road where the collision occurred. These varying circumstances render it impossible to establish a rule like that in the Piggott and Ellis cases, except upon the false basis of assuming a fixed state of circumstances for something that is wholly uncertain in its nature. The law permits a train to be run upon its track as rapidly as its business requires, and is consistent with the safety of the passengers and the property it transports, without moderating its speed on account of the probability of

coming upon roaming cattle. It is in its nature a thing upon which in its legitimate use not only great force necessarily attends but is of such a character that when moving at a legitimate or ordinary rate of speed it cannot be stopped at once or always in time to avoid collision with something that may have unexpectedly come upon its track. The place or the circumstances of the coming of cattle cannot be anticipated, like the circumstances which may surround when a train passes a fence or a building. The law which permits the operation of a train charges the owner of any animal coming on its track with notice of its nature. If it be dangerous it is still lawful. In running at an ordinary speed it is doing nothing forbidden, but the very thing contemplated by its organization and required by the commerce of the country. It has just as much right to run as cattle have to range. Grant that cattle which go upon its track are not trespassers, nor their owners liable for damages resulting therefrom to the railroad companies (which is well settled by preceding authorities,) yet when they do go upon it and collision takes place and death or anything ensues to them, and nothing else appears, how can it be said that there is evidence of any omission of duty upon the part of the railroad company or its agents, the law being, as it is, that it is not required to lessen the otherwise proper speed of its trains on their account? No one is presumed by the law to do wrong or not to do his duty. Proof of results which indicate only an ordinary and proper act, and no extraordinary or improper conduct in an individual, is no evidence of negligence on his part. Proofs of death to a hog, sheep or cow by being struck by a railroad train is proof of a result which indicates nothing more than an ordinary operation of the train ; to say there was negligence we have to assume from what is altogether uncertain that the circumstances were of a certain character and such

that the injury, or what is tantamount, the collision, might have been avoided by the exercise of due care upon the part of the company's agents. Grant, as we must, that proof of the locality of the collision will generally show whether or not, by proper attention, the animal on the track could have been seen in time for the train to be stopped by the prompt use of brakes and the collision avoided, yet when we know that cattle may and sometimes do come upon the track at places, and under circumstances where this would be impossible, and it may be, even when for the protection of the lives of passengers, an increase of speed is necessary, (Owens vs. R. R. Co., 58 Mo., 388, 389,) still we cannot assume as a general rule not only the circumstances but that they were such as that the killing would not have occurred if proper care had been shown, and as imply a want of care on the company's part.

The reasoning in Danner's case is exceptional. Where the burden is put by the pleadings upon the plaintiff, there is no rule of law that the defendant's failure to produce witnesses upon trial, or his silence there as to what he may know, can be taken to make a *prima facie* case for the plaintiff. Where the plaintiff's evidence is insufficient the defendant may demur to it successfully. The fact that witnesses to an occurrence are in the employ of a railroad company imposes upon it no more duty to produce them or their evidence at the trial than their being employed by an individual would impose on him. The rules of evidence permitting proof by admissions—silence, where an act has been specifically charged in conversation against a defendant—has never been extended to a defendant preserving silence in court until a *prima facie* case has been made by plaintiff's evidence on the trial. Under our rules of evidence by which, as a general rule, neither interest nor being a party to the record disqualifies from testifying, " the

fact that it was in the power of the defendant alone to explain, and he failed to do it," is not tenable as a principle upon which to support the ruling in Danner's case, if it ever was. One party can make a witness of the other.

Independent of any legislation on the subject, we do not think that proof of the mere killing, independent of locality or some other circumstance which shows that it would not have resulted if reasonable care had been taken, or some omission of duty, as a failure to blow the whistle for the purpose of scaring the cattle off, is *prima facie* evidence of negligence upon the part of the company. B. & M. R. R. vs. Wendt, 12 Neb., 76; Schiner vs. R. R. Co., 40 Iowa, 337; Bathje vs. R. R. Co., 26 Texas, 604; Walsh vs. R. R. Co., 8 Nevada, 110; R. R. Co. vs. Means, 14 Ind., 30; McKissock vs. R. R. Co., 73 Mo., 590; R. R. Co. vs. McMillan, 7 (Ohio) A. & E. R. R. Cases, 588; see also 19 A. & E. R. R. Cases, 458, note.

What legislation has taken place is now to be inquired into.

In the year 1875, " an act to provide a *means* for the *collection* of *claims* for cattle and other stock destroyed by railroads," became a law without the approval of the Governor. It passed the Assembly February 18th, and the Senate on the 25th of the same month. Its first section enacts: " That all railroad companies operating in this State shall be held liable for damages to cattle, horses or other stock by the cars or trains of such company or corporation, either by killing or maiming animals, and the amount of damages shall be established by affidavit of the owner or some other person acquainted with the stock so killed or maimed." Its second section provides: " That damages established as aforesaid may be sued out and judgment obtained in any court having jurisdiction of the amount so established in the same manner as other evidences of debt."

The third section provides for the service of process, the fourth, that all real and personal property of the corporation shall be liable to execution issued in such an action, and the fifth, for garnishment proceedings against a depot agent.

If the purpose of this act was to create an absolute liability upon the part of railroads independent of any question of negligence, (which we are not satisfied can be done; Macon & Western R. R. Co. vs. Davis, 13 Ga., 68; Zeigler vs. R. R. Co., 58 Ala., 594,) then the title of the act is not sufficient to support this purpose, but is too constrained. It is confined by its words to providing means for collecting claims having at its passage a status in law, or similar ones to arise in the future, and excludes the idea of making that a claim which without it would not be one. Carr vs. Thomas, 18 Fla., 736; 13 Ga., 86.

If it be the plain meaning of the first and second sections that the affidavit provided for is to be taken as *conclusive* evidence of the damage or of the "amount" thereof, and that upon such affidavit as an evidence of debt, the action may be instituted and judgment obtained without right upon the company's part to be heard as to negligence and the amount of damages, or as to either, then they do not provide due process of law and cannot stand. Cooley Cons. Lim., 432.

To establish, according to Webster, means to make stable or firm; to fix or set unalterably; to settle or confirm; to enact or decree by authority and for permanence; to decree; to enact; to ordain;—said of laws, regulations and the like; to settle or fix;—as anything wavering or doubtful or weak. Worcester's definition is not materially different. The plain meaning of the language used in the first section is that the affidavit should fix, set unalterably, settle, make stable or firm the amount of the damages, and

the second section in no wise qualifies this meaning. By the latter it is provided that the damages established by the affidavit, the amount of the damages thus fixed or unalterably settled,—damages, the amount of which is settled by the affidavit as permanent evidence—may be sued out and judgment obtained in the same manner as other evidences of debt. The provision that the suit shall be in the same manner as other evidences of debt cannot be construed as qualifying the effect previously given to the affidavit, but only as intended to provide that the action should be brought on the affidavit as an evidence of debt, the settled character of the evidence being previously fixed. If, however, we construe the second as qualifying the first section so far as the character of the evidence is concerned, then all the rules of pleading and evidence which obtain in case of actions on other evidences of debt will apply, and a proper plea upon the part of the company, denying the debt, will cast on the plaintiff the burden of proving everything necessary to constitute the debt, including negligence, and leave the statute without any effect upon the ordinary rules of pleading and evidence.

After the most careful consideration we are capable of giving the subject, we have come to the conclusion that the meaning and purpose of the statute are to make the affidavit conclusive evidence of at least the amount of the damages, and that no other construction can be placed upon it without ignoring the plain meaning of the language used, and constructing ourselves something which the statute does not sustain.

The Legislature cannot thus create judgments, even as to the single element of the amount of the damage upon the basis of an ex-parte affidavit, nor as to such element and those of the killing or injury and negligence.

It is within the power of the Legislature to provide that

proof of the killing or of damage to live stock by railroad engines or trains shall be *prima facie* evidence of negligence on the part of the company or person operating them, as has been wisely done in some States, in view of the fact that the company always has witnesses to the killing or injury; and it may also require railroad companies to fence the tracks, and as a penalty for not doing so subject them to payment for all stock killed or injured, even to double the amount of the value or injury. Jones vs. C. & U. R. R. R. Co., 16 Iowa, 6 ; Mo. P. R. Co. vs. Henner, 115 U. S.

We think the demurrer to the declaration should have been sustained, and that the court erred in charging the jury as to the killing being made *prima facie* evidence and in refusing the instructions numbered 2 and 7 requested by the defendant, but that it did not err in refusing the instruction numbered 2, as it uses the word willful, or in refusing that numbered 4, nor that numbered 6, as it is too broad.

The judgment is reversed and the case will be remanded with directions to sustain the demurrer to the declaration, with leave to the plaintiff to amend the declaration and for further proceedings in accordance with this opinion.