Yazoo & Mississippi Valley Railroad Co. *v.* Bettie Hare
ET AL.

[61 South. 648]

1. MASTER AND SERVANT.    *Wilful acts of fellow-servants.    Liability.    Appeal and error.    Harmless error.    Instructions.    Admissibility of evidence.    Reputation.*

A railroad company is liable in damages for the negligent killing by its night watchman while acting within the scope of his employment of a fellow-servant.

2. SAME.

Where the negligent killing by such watchman of his fellow-servant was clearly within the scope of his employment, no harm was

done the defendant railroad company by the court's failure at the trial, to specifically charge the jury that the act done must have been within the scope of the servant's authority.

3. MASTER AND SERVANT.    *Liability.    Fellow-servant.    Reputation.*

In a suit for damages against a railroad company for the negligent killing by its night watchman of a fellow-servant, where the declaration averred that the night watchman was known to be oppressive and malicious in his conduct towards those with whom he came in contact and that this was well known to the defendant and to the community in general before the killing. Evidence of the reputation and character of defendant's night watchman was admissible.

APPEAL from the circuit court of Warren county.

HON. H. C. MOUNGER, Judge.

Suit by Bettie Hare and others against the Yazoo & Mississippi Valley Railroad Company. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*Mayes & Mayes,* for appellant.

The first point which we desire to submit is this: That the court erred in allowing the plaintiffs below, over the objection of the defendant, to prove the general reputation of Gillis as a night watchman "for competency and incompetency and peace and violence, in his treatment of the employees and public generally," before the killing of Hare, and to prove that it was bad.

We have pointed out above how closely the testimony in this case must have been balanced, and what a troublesome and doubtful case it must have been, for the plaintiffs, to say the least of it.

Mr. Gillis had been acquitted of the charge of unlawful killing in the state's prosecution; there had been three hung juries, even in the civil suit against the railroad company, and this was the fourth trial of the civil suit. It will, therefore, be idle to say that it was not a case of, at the least, close testimony and doubtful credibility.

In a crisis like this, the rights of the parties are not controlled by general reputation and general character, but by what is done, and the foregoing proposition is sustained by the authorities.

In *Lienkauf* v. *Brinker,* 62 Miss. 255, this court practically so held. It is true that in that case the charge was one of fraud, but the court held that where the matter under investigation is one of specific transaction, the court must depend upon its circumstances and not upon the character of the parties, and the court in that connection reviews the authorities and criticizes the case of *Ruan* v. *Perry,* which seems to be the leading case for that view, and aligns this court as being opposed to any such view, and as declining to give its adhesion to Mr. Greenleaf's proposition in that connection.

We quote from 16 Cyc. 1263 as follows: ''That a person did or did not do a certain act because his character would predispose him to do or not to do it, is an inference which, although sometimes logically probative, the English law of evidence, with some exceptions, absolutely rejects, in civil cases.''

Observe the strength of the expression. The proposition is absolutely rejected in civil cases. The author thereupon proceeds to cite authorities from many states, to the extent of nearly a whole printed page. It will be seen by these authorities, of which we have verified many, that the case at bar does not fall within any of the exceptions.

We submit that the admission of this evidence was unlawful; and in view of the course of these trials as shown by the record, it was manifestly highly prejudicial and materially conduced to produce the verdict complained of.

The damaging effect of the admission of this incompetent evidence is greatly enhanced and is enforced by plaintiff's fourth instruction and also by the eighth instruction for plaintiff. These instructions, the incompe-

tent evidence having been admitted, expressly instruct and authorize the jury to infer from the fact alleged of Gillis' general badness, that his act in shooting the deceased was unlawful; and notwithstanding the fact that the shooting was proven in all its circumstances, or at least was claimed by the plaintiffs to have been, by eyewitnesses.

A great many instructions were asked by the defendant in this cause; of which several were given and quite a number refused.

We shall not trouble the court, for it would be quite a tax, to take up these instructions and consider them one by one. Indeed to do so would be but to travel repeatedly over the same ground. We will submit to the court one proposition as to which, if the court shall approve it, it will be a touchstone by which to test many of these instructions and to show that certain of those given for the plaintiff were improperly given because they ignore the true test of liability; and for the same reason certain of those refused to the defendant should have been given and the refusal of them was erroneous.

The proposition, briefly stated, is this: That in the instructions given for the plaintiff, entirely too much stress, in fact all of the stress, is laid upon the proposition that the killing was done by Gillis while he was about the railroad company's business, and the element is retired from sight, and is completely ignored, that what Gillis did must have been done within the scope of his employment.

There is no evidence in this record that Gillis was authorized to shoot anybody or to carry his watchmanship to the point of inflicting death or wounds upon persons under any condition. The error in refusing instructions for defendant consists in the fact that those instructions were intended to develop and bring to the attention of the jury these propositions of law; and the court would not permit the defendant so to do.

In brief, it is not a mere question that the employee who inflicts the injury is at the time engaged in his master's business; but also it is necessary that being so engaged in the master's business, what he does comes within the scope of his employment. The idea is a little subtle, but it has been fully expressed and elucidated in the books. We cite the court to the annotated case of *Goodloe* v. *Memphis, etc., R. R. Co.* (Ala.), 54 Am. St. Rep.——, and the very elaborate note thereto.

We also refer to the case of *Richberger* v. *American Express Co.*, 73 Miss. 161, as that case is reported in 55 Am. St. Rep. 522, and annotated; and *Barmore* v. *Railroad Co.*, 85 Miss. 426.

We earnestly submit that the evidence in this case shows that it is an instance where the killing falls clearly within the rule as stated in those authorities, and as held within the rule as held in the Mississippi cases. There was no authority to this watchman shown in the record to have been conferred, either expressly or by implication by the railroad company on this man to shoot anybody under any circumstances, and in so doing it was his independent act, and while he did it (we will concede, although the evidence does not make it clear) at a time when he was serving as watchman and, therefore, was engaged about his business as such, it was not within the scope of his employment but was an outside and independent wrongful act of his own.

The instructions which the defendant requested announcing this view, and which the court refused, should have been given.

*J. D. Thames* and *Brunini & Hirsch,* for appellees.

"It is well settled in all jurisdictions that the reputation of the employee is receivable to show that the employee's character, in respect to competency, was known to the employer." 1 Wigmore on Evidence, sec. 249.

We copy the closing paragraph of the foregoing section of Wigmore, to be found on page 320 of the first volume of

Wigmore: "It is to be noted that the substantive law may be such that the evidential question, whether such, reputation was likely to reach the employer, does not arise; i. e., it maybe held that if a reputation of incompe- tency had arisen, then, even if the employer did not in fact hear of the reputation, yet this failure to learn of such an easily knowable thing is in itself negligence, as a matter of law, in that it involves failure to make inquiry concerning competence:

"1870, COOLEY, *J., in Davis* v. *R. R. Co.,* 20 Mich. 105: 'If the defendants continue a man in their employ who is so notoriously unfit as to have established a gen- eral reputation to that effect, it is unreasonable (the plaintiff argues) to suppose the officers of the defendants ignorant of that fact; unless we excuse their want of in- formation on the ground of neglect of duty on their part to their employees and the public, so gross as to make it proper and just to hold them responsible to the same ex- tent as if they were fully informed of all the facts.'

"1890, FIELD, J., in *Monahan* v. *Worchester,* 150 Mass. 440, 23 N. E. 228: 'If a person is incompetent for the work he is employed to do, the fact that he is generally reputed in the community to want those qualities which are necessary for the proper performance of the work, certainly has some tendency to show that the master would have found out that the servant was incompetent, if proper means had been taken to ascertain the qualifica- tions of the servant.' "

For the correctness of our position we rely upon the decision of the United States Supreme Court in the case of *Northern Pacific R. R. Co.* v. *Mares,* 123 U. S. 710, 31 L. Ed. 296.

The instructions on this point, given by the court on behalf of plaintiff were drawn in accordance with those approved by the United States Supreme Court in this case.

We submit that testimony which went to show the reputation of Gillis as a night watchman was perfectly

competent and relevant, under the issues made in this case. *Railroad* v. *Patton,* 31 Miss. 194; 1 Wigmore, secs. 249 and 250, and cases cited; *Magouirk* v. *Tel. Co.,* 79 Miss. 633; *Railroad* v. *Hicks,* 91 Miss. 354; *Railroad* v. *Stupal,* 123 Ind. 210; *Davis* v. *Railroad,* 20 Mich. 105.

The second point made by appellant is stated as follows: ''The proposition briefly stated is this: That in the instructions given for the plaintiffs entirely too much stress—in fact, all of the stress is laid upon the proposition that the killing was done by Gillis while he was about the railroad company's business, and the element is retired from sight, and is completely ignored, that what Gillis did must have been done within the scope of his employment. . . . In brief, it is not a mere question that the employee who inflicts the injury is, at the time engaged in his master's business, but also it is necessary, that being so engaged in the master's business, what he does comes within the scope of his employment, the idea is a little subtle, but it has been fully expressed and elucidated in the books . . . There is no evidence in this record that Gillis was authorized to shoot anybody, or to carry his watchmanship to the point of inflicting death or wounds upon persons under any condition.''

If the last paragraph above quoted is the test of the liability of the master, that is that there can be no liability unless the servant was authorized to inflict the injury, then, this renders the master immune from the wrongful acts of his servants. Appellant cites no authority for this proposition. It is rather startling to us that it should have been made. It is in direct conflict with the authorities.

''And if the wrongful act of the servant was impliedly within the scope of his employment, the master's liability therefor is not affected by the fact that the servant acted in disobedience of the master's express instructions; nor is it material that the wrongful act was not expressly authorized by the master, or ratified by him.'' 20 Ency. 170.

The question whether or not he was acting within the scope of his employment, should not have been submitted to the jury, and, therefore, the second point made by appellant must fail.

But even if we are mistaken in our view on this point, we contend that the instructions given announce correctly the proposition of law, and we submit to the court a careful consideration of instruction six, seven and eight given for plaintiffs as announcing the law correctly on the subject.

Notice the language of instruction six: "While in the discharge of their master's business, for which they are employed."

Again, the language of instruction seven: "While going about his master's business, for which he was employed." This language is synonymous with "done within the scope of his employment."

The case of *Richberger* v. *Express Co.*, 73 Miss. 161, expressly overrules the earlier authorities and follows the later line of decisions. So does the case of *Barmore* v. *Railroad Co.*, 85 Miss. 426, and *A. & V. Ry. Co.* v. *Baldwin*, 52 So. 358. The case of *Goodloe* v. *Memphis R. R. Co.* (Ala.), 54 Am. St. Rep. ——, follows the old line of decisions. See also *Magouirk* v. *Tel. Co.*, 79 Miss. 632.

We beg to refer the court to the case of *Lipscomb* v. *R. R. Co.*, 93 Am. St. Rep. 804, wherein the Richberger doctrine is announced and approved. We also refer the court to the case of *McCarthy* v. *Timmons*, 86 Am. St. Rep. 490. The syllabus in the last paragraph on page 491 states the Richberger rule. We beg to refer the court to the note thereto.

. But why multiply authorities? The master is liable for the acts of his servants when done about the master's business, for which the servant was employed.

In conclusion, we submit that the liability of appellant is clearly within the rules laid down in the Richberger, the Barmore and the other later decisions of this hon-

orable court. These decisions hold that the test is not whether or not the master authorized the act; not whether or not the master authorized the servant to shoot anybody under any circumstances; all that is required, as is stated in the Richberger case, is for the plaintiffs to show, "solely whether the act constituting the tort was done in the master's business." 73 Miss. 169.

Argued orally by *J. D. Thames* and *J. A. Brunini,* for appellee.

Cook, J., delivered the opinion of the court.

Bettie Hare and the seven children of James Hare, deceased, sued the Yazoo & Mississippi Valley Railroad Company, appellant here, in the circuit court of Warren county, for the alleged negligence of the night watchman of said company in causing the death of James Hare. James Hare, deceased, was employed by the railroad company as a sweeper in the roundhouse of the company at Vicksburg, and J. S. Gillis was employed as a night watchman in the yards of the company at the same place. After the completion of his work for the day, Hare was going through the yards of the company to his home, when he was killed by J. L. Gillis the night watchman. Plaintiffs recovered a judgment for five thousand dollars, and the railroad company appeals.

It is assigned for error in this court that the court erred in some of its instructions to the jury. While the instructions may not be accurately and precisely correct, yet we think, in the light of the facts of the case, no wrong was done the defendant by the instructions of the court. The instructions complained of in effect state to the jury that, if Gillis negligently killed the deceased while he was about the railroad company's business the jury would find for plaintiffs. It is contended that what Gillis did must have been within the scope of his employment, and that this principle was "retired from sight, and is completely ignored." It seems to us that what Gillis did was

clearly within the scope of his authority as a night watchman; and, this being true, no harm was done the defendant railroad company by the court's failure to specifically charge the jury that the act done must have been within the scope of the servant's authority.

Again, it is contended that the court erred in permitting the plaintiffs in the court below to prove the bad character and reputation of the night watchman for peace or violence, and that this reputation was well known to the defendant company. We find the following averment in the declaration: "Plaintiffs further aver that the said ·Gillis, while in the discharge of his said duties, was known to be oppressive and malicious in his conduct towards those with whom he came in contact; that this was well known to the defendant and to the community in general before the killing of Hare. Plaintiffs further aver that the said defendant retained the said Gillis in its employ, well knowing the facts aforesaid, relative to his said conduct."

In *Vicksburg & Jackson R. R. Co.* v. *Patton*, 31 Miss. 194, 66 Am. Dec. 552, this court employed the following language: "Upon the question involving his character and fitness for his trust, and the consequent responsibility of the company for his delinquency in these respects, it is not only competent, but necessary, to inquire into his previous habits and conduct, in order to show that the alleged misconduct at the time of the injury was in keeping with his general character. Frequently it may be out of the power of a party to show positively the reasons of a delinquency of such an agent; and in such case it is proper and necessary to show his general character, in order to explain his conduct at the time." This language was used by this court in a case where the railroad company was being sued for its alleged negligence in killing certain animals on its track, and evidence was introduced to show that the engineer in charge of the train had previously been in the habit of sounding the whistle when

there was no occasion for it, to frighten animals, and.to annoy the neighbors on the road.

In *Magouirk* v. *Telegraph Co.,* 79 Miss. 636, 31 South. 207, 89 Am. St. Rep. 663, the court said: "The testimony as to the habits of a telegraph operator was addressed, as we understand it, to his fitness and suitableness for the place he held, and in that view should have been admitted"—citing *Railroad Co.* v. *Patton, supra.* In this case the telegraph operator had sent a bogus telegram to a gentleman, signing the plaintiff's name thereto, and the evidence introduced to show the character of defendant's agent was to the effect that he was in the habit of drinking excessively, and was boisterous and rough in his general deportment.

In *Railroad Co.* v. *Hicks,* 91 Miss. 354, 46 South. 389, 124 Am. St. Rep. 679, the court said this: "We may say at once and so dismiss this matter, that the cause on the testimony is bottomed chiefly, if not exclusively, upon the negligence of the master in having in its employ a thoroughly incompetent and reckless engineer, and upon the wilful and reckless conduct of this engineer in running this first passenger coach over this new, rough, unballasted road at its excessive rate of speed."

We think the reputation and character of defendant's night watchman was peculiarly pertinent in this case, as, in our opinion, the evidence in the case justifies the assumption that James Hare was killed largely because defendant's night watchman was a violent, dangerous and oppressive man; and it appears, also, from the evidence, that these characteristics of the watchman had been brought to the attention of the railroad company, and that afterwards this sort of man was continued in their employment.

*Affirmed.*